Nos. 102,075
102,164

KANSAS MEDICAL MUTUAL INSURANCE COMPANY, *Petitioner*, v.
THE HONORABLE RON SVATY, *Respondent*, and JEANETTE
ALLEN, *Appellee*, v. WILLIAM SLATER, M.D., *Appellee*, and
KANSAS MEDICAL MUTUAL INSURANCE COMPANY, *Appellant*.

(244 P.3d 642)

598

Opinion filed December 10, 2010.

*Greg L. Musil*, of Polsinelli Shughart PC, of Overland Park, argued the cause, and *Lisa A. Weixelman* and *Lauren E. Tucker McCubbin*, of the same firm, of Kansas City, Missouri, were on the brief for petitioner/appellant Kansas Medical Mutual Insurance Company.

*Larry W. Wall*, of Larry Wall Trial Law, of Wichita, argued the cause, and *Terri Fahrenholtz*, of Brennan Law Group P.A., of Wichita, was with him on the brief for appellee Jeanette Allen.

*James R. Howell* and *Derek S. Casey*, of Prochaska, Giroux & Howell, of Wichita, were on the brief for *amicus curiae* Kansas Association for Justice.

The opinion of the court was delivered by

LUCKERT, J.: This case arises from the consolidation of an original action in mandamus and a collateral order appeal, both filed by Kansas Medical Mutual Insurance Co. (KaMMCO). KaMMCO seeks relief from a discovery order entered in a pending medical malpractice action. KaMMCO, which is not a party in the underlying medical malpractice action and does not insure the malpractice defendant, argues that the district court failed to "protect [its] privileges, to protect its confidential and proprietary information, [and] to relieve it from the undue burden of complying with the onerous discovery sought." The plaintiff in the underlying medical

malpractice action argues the discovery is reasonably calculated to lead to evidence of bias on the part of the defense expert, who is insured by KaMMCO, and that KaMMCO has not met its burden of establishing the applicability of privileges or the burdensome nature of the discovery.

We first address our jurisdiction and conclude that we lack jurisdiction to consider this appeal under the collateral order doctrine. Consequently, the appeal from the district court's decision (Case No. 102,164) is dismissed. We find, however, that a writ of mandamus is an available remedy in this case where a nonparty has asserted privileges that could not be protected on a direct appeal from the underlying action. We also conclude that a writ of mandamus is an appropriate remedy because the district court did not perform the duties imposed by this court in *Berst v. Chipman,* 232 Kan. 180, 653 P.2d 107 (1982), relating to discovery requests served on a nonparty who asserts objections of privilege, confidentiality, irrelevance, and burden. Consequently, we enter a writ of mandamus in Case No. 102,075, granting KaMMCO's petition in part and denying it in part, and we remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

Jeanette Allen filed the underlying medical malpractice action against William Slater, M.D. During pretrial discovery, Dr. Slater designated Dr. Ted Macy as his expert witness. The use of Dr. Macy as an expert became a point of contention, leading Allen to file a motion to strike Dr. Macy as an expert. Judge Ron Svaty, the district judge presiding over the underlying medical malpractice action, denied the motion but allowed additional discovery regarding Dr. Macy and his opinions. In addition to interrogatories seeking supplementation of Dr. Macy's opinions and some additional information, Allen served a notice of subpoena duces tecum to take the deposition of officials at KaMMCO. Dr. Macy is an insured of KaMMCO, and Allen believed this formed a connection between Dr. Macy and Dr. Slater because Dr. Slater testified at his deposition that he was insured "by KaMMCO or a branch of KaMMCO."

Allen, in the "Notice to Take Deposition and Subpoena Duces Tecum," included a section labeled "Background and Basis for Subpoena." As part of that background, Allen noted that KaMMCO is a " 'member-owned' insurance company providing insurance protection for health care professionals." Quoting information from KaMMCO's website, Allen pointed out that KaMMCO "recognizes that 'avoiding claims and their financial consequences' is important to health care professionals" and that KaMMCO "has established a claims policy that 'aggressively defends members.' " Allen further quoted other statements on the website that referred to building a " 'defense team' " and to "the importance of a strong defense, ardent support, and 'member involvement.' " Allen concluded the background and basis section of the document by stating: "One of the 'duties and responsibilities' of a KaMMCO Insurance Claim Adjustor/Medical Liability Analyst is to 'locate and obtain experts.' . . . Defendant William Slater, M.D., and his designated expert witness, Ted Macy, M.D. are fellow members of KaMMCO."

Allen then made the following requests:

"1. Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of 'member-owner' benefits, interests and duties;

"2. Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of 'aggressive member defense and protection,' including any advice, suggestions, tips and/or guidelines for giving testimony for both (a) members being sued for malpractice and (b) members who serve as defense expert witnesses in malpractice cases;

"3. Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of the benefits of 'avoiding the financial consequences of claims,' including the financial impact of the cost of claims on the cost of insurance premiums;

"4. Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of the methods, policies and procedures utilized when 'locating and obtaining' the expert witness services of Dr. Macy in this case; the nature and scope of Dr. Macy's 'member involvement' as an expert witness on Dr. Slater's 'defense team' in this case; the identities of any KaMMCO personnel who have had any contact with Dr. Macy regarding this case; and the information exchanged between KaMMCO and Dr. Macy regarding this case.

"5. Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of any claims, with the exception of the

claim by Jeanette Allen, reviewed by Dr. Macy for KaMMCO, regardless of whether any written report or expert testimony followed;

"6.   Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of any claims reviewed by Dr. Slater for KaMMCO, regardless of whether any written report or expert testimony followed;

"7.   Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of the history of any claims against Dr. Macy while a member of KaMMCO, regardless of whether a lawsuit was filed or compensation was paid; and

"8.   Please designate and make available to testify the KaMMCO representative(s) most knowledgeable in the areas of the history of any claims against Dr. Slater while a member of KaMMCO, regardless of whether a lawsuit was filed or compensation was paid."

In addition, the notice states that all designated deponents shall produce copies of the following documents at the deposition:

"1.   All written materials, including but not limited to seminar materials and correspondence, used by KaMMCO in any fashion to educate members regarding the subjects of malpractice claim defense, including any tips on how to properly give a deposition and/or testify at trial, applicable to both defendants and defense expert witnesses;

"2.   All written materials received from Dr. Slater pursuant to the contract of malpractice insurance between KaMMCO and Dr. Slater which provides coverage for Jeanette Allen's claim. If any materials have been received from Dr. Slater, this request is intended to cover all materials received for any purpose, excepting only those materials which are claimed to be privileged. . . .;

"3.   All written materials received from Dr. Slater for any application(s) for malpractice insurance between KaMMCO and Dr. Slater. This request includes all years in which Dr. Slater made applications for coverage. . . .;

"4.   All written materials received from Dr. Macy for any application(s) for malpractice insurance between KaMMCO and Dr. Macy. This request includes all years in which Dr. Macy made applications for coverage. . . .;

"5.   All written materials sent by KaMMCO to Dr. Slater concerning his application(s) for malpractice insurance. . . .;

"6.   All written materials sent by KaMMCO to Dr. Macy concerning his application(s) for malpractice insurance. . . .;

"7.   All Risk Management Surveys concerning Dr. Slater. If there are any documents concerning KaMMCO's evaluation or analysis of the underwriting risk of Dr. Slater, please produce the same. . . .;

"8.   All Risk Management Surveys concerning Dr. Macy. If there are any documents concerning KaMMCO's evaluation or analysis of the underwriting risk of Dr. Macy, please produce the same. . . .;

"9.   All compliance surveys, reviews or reports concerning Dr. Slater. . . .;

"10. All compliance surveys, reviews or reports concerning Dr. Macy. . . .;

"11. All medical records obtained by KaMMCO from any source concerning Jeanette Allen;

"12. All documents, other than medical records, received by KaMMCO from any source concerning Jeanette Allen. . . .; and

"13. All documents, other than medical records, sent by KaMMCO to anyone concerning Jeanette Allen."

At the end of every document demand except those in paragraph 1 and 11, Allen ended the request with the following statement: "If any materials are claimed to be privileged, please provide a privilege log which identifies the material claimed to be privileged and specifies the basis for each privilege claimed. ([S]ee *Cyprus Media, Inc., v. City of Overland Park,* 268 Kan. 407, 997 P.2d 681 [2000])."

Within days of receiving a copy of the subpoena, Dr. Slater filed a motion for a protective order. He raised several objections to Allen's attempt to seek discovery from KaMMCO, including several procedural issues. In addition, he objected on the grounds that the request sought (1) "confidential and protected health information of patients who have filed claims or lawsuits against Dr. Slater and/or Dr. Macy"; (2) "information/documentation of prior settlements" the disclosure of which "would necessarily invade the confidentiality provisions contained in prior settlement[s]"; and (3) information that has not been "shown to be relevant to the present lawsuit and cannot lead to the discovery of admissible evidence."

KaMMCO then filed a "Motion to Quash and/or Motion for Protective Order," seeking relief from the subpoena. KaMMCO noted it was not a party in the case and asserted eight grounds for quashing the subpoena: (1) the information was "not relevant or likely to lead to the discovery of evidence of admissible evidence in this medical malpractice case"; (2) the factual information was available from other sources, in particular from Dr. Slater and any designated expert; (3) the requests would require a search of "all of its corporate records as it pertains to its insurance provided to the defendant and defendant's named expert" and that search would be burdensome; (4) information regarding insurance coverage is not admissible "in this type of case"; (5) the requests are

"broad enough to invade the attorney-client privilege"; (6) the requests are "broad enough to invade the attorney work product doctrine"; (7) the requests are "broad enough to invade the insurance claim file and matters investigated and processed at the request of an attorney"; and (8) the requests are "prohibited from discovery under the Kansas Peer Review laws." Expanding on these objections, KaMMCO argued that there is no connection between the outcome of the medical malpractice action and KaMMCO's or Dr. Macy's financial interests and that Allen failed to provide any basis for the district court to find otherwise.

In her written response, Allen asserted that the requested information pertained to potential bias arising from the financial interests of Dr. Slater and Dr. Macy with regard to the outcome of the medical malpractice action. In responding to KaMMCO's motion to quash, Allen explained the basis for the potential bias: "As a physician who purchases malpractice insurance from KaMMCO, Dr. Macy may well have a financial interest in the outcome of this litigation as the cost of defense and payment of claims may affect the cost of Dr. Macy's insurance premiums." Allen also argued she was not seeking any confidential or protected information and that it was too early for the district court to determine what evidence would be admissible. In a supplemental response, Allen raised concern about the discrepancy in information, since KaMMCO asserted it did not insure Dr. Slater, but Dr. Slater had stated that he was insured by KaMMCO. Allen emphasized the need for discovery to clarify this question.

The district court conducted a hearing on the motion, and during the hearing it became even more apparent that there was a misunderstanding about whether Dr. Slater was insured through KaMMCO. KaMMCO offered to provide an affidavit regarding whether it provided any coverage.

Shortly after the hearing, KaMMCO submitted affidavits of Karolyn Scanlon, Underwriting Manager for KaMMCO, and Kurt Scott, Chief Operating Officer for KaMMCO. Both affidavits confirmed that Dr. Slater is not now nor has he ever been insured by KaMMCO. Both affiants averred that KaMMCO acts only as the servicing carrier of Dr. Slater's insurer, the Kansas Health Care

Provider Insurance Availability Plan (the Plan). A "servicing carrier," according to Scott, is essentially an administrator. Scott further indicated that "KaMMCO does not now nor has it ever had a financial ownership or investment interest in the Plan" and, while KaMMCO receives a fee to act as the Plan's servicing carrier, the fee is "not dependant upon, or impacted by, the number of dismissals or defense verdicts obtained" for physicians insured by the Plan. In other words, "KaMMCO does not have any KaMMCO money at risk if a judgment or settlement is obtained against a Plan physician."

Following the filing of the KaMMCO affidavits, numerous motions were filed regarding discovery disputes, including a motion for hearing filed by Allen. In this motion, Allen acknowledged the contents of the affidavits submitted by KaMMCO representatives and admitted that "Dr. Macy may not have an obvious financial interest in the outcome of this claim as a member-owner of KaMMCO." Nevertheless, she claimed that other bias might be shown because of KaMMCO's "defense-oriented programs and materials." Allen also argued that "KaMMCO, the servicing carrier of [the Plan], may be in possession of information and evidence relating to defendant's last-resort malpractice coverage through [the Plan.]"

After additional briefing and a hearing to settle Allen's proposed journal entry which allowed her to conduct discovery of KaMMCO without limitation, the district court entered its discovery order over KaMMCO's objections. Regarding privileged information, the district court stated at the hearing that KaMMCO's objections should be raised during production and that KaMMCO was prematurely "trying to make these objections before they even start." The court indicated that KaMMCO's objections seemed to "be another delay tactic." Counsel for KaMMCO asserted that "regardless of what the journal entry says, we don't have to produce privileged material. . . . We're not going to give it to them." The district court agreed that KaMMCO was not obligated to provide privileged material.

At the same hearing, counsel for KaMMCO also requested that confidential or proprietary information be produced "in a setting

where it's safe from disclosure to parties who don't need it, meaning other attorneys and people who aren't party to this action." Counsel for Allen was not agreeable to this request because "I have numerous attorneys that are interested in this issue across the state" and "I'm the chairman of the medical malpractice committee in the state of Kansas, and every attorney on that committee is vitally interested in this information and they have all contributed to the briefing and the work in this case." After taking time to review the file, the district court denied KaMMCO's request for a protective order and ordered KaMMCO to respond to Allen's subpoena. The court made no specific mention of a privilege log or an in camera inspection of requested information.

Afterward, KaMMCO acknowledged that some of the information sought in Allen's subpoena was not privileged or confidential, and it was "willing to produce a witness to testify to the nonprivileged, nonproprietary information" and was willing to "produce non-privileged, non-proprietary documents responsive to the Subpoena as well." KaMMCO also expressed a willingness to produce a witness to testify "only as to the identities of any KaMMCO personnel who have had contact with Dr. Macy regarding this case." This effort was apparently rejected by Allen.

Another hearing was held on Allen's motion to enforce the district court's discovery order and on KaMMCO's request for certification of the discovery issue for interlocutory appeal. At the hearing, Allen argued, *inter alia*, that pursuant to *Cypress Media, Inc.*, 268 Kan. 407, KaMMCO should produce a privilege log identifying any documents claimed to be privileged, in lieu of requiring production of such material directly to Allen. No privilege log was ordered. As for KaMMCO's request for certification for interlocutory appeal, it appears the district court denied it, although we can find no specific ruling in the record on appeal.

These events led to KaMMCO filing an original action in mandamus seeking a writ requiring the district court to follow *Berst*, 232 Kan. 180. Then, KaMMCO filed an appeal in the Court of Appeals, using the collateral order doctrine as a basis. Subsequently, the collateral order doctrine appeal was transferred to this court and the cases were consolidated. In both the appeal and the

petition for writ of mandamus, KaMMCO seeks relief to protect its privileged or confidential information, to relieve it from the undue burden of complying with an "onerous" discovery request and to permit only requests which are likely to lead to the discovery of admissible evidence.

KaMMCO also sought a stay of the enforcement of the subpoena. This court granted the request and ordered that "until the consolidated action is finally decided by this court, all other district court proceedings in *Allen v. Slater* are stayed, as jurisdiction over the matter now resides in this court alone." The district judge advised this court that, pursuant to Supreme Court Rule 9.01(c) (2010 Kan. Ct. R. Annot. 75), he will not respond in this matter.

## JURISDICTION

A preliminary question to be considered in this case is whether this court has jurisdiction to review the district court's discovery order under (1) the collateral order doctrine, a narrow exception to the general rule that only final orders may be appealed as a matter of right or (2) the petition for writ of mandamus.

### Standard of Review

Whether jurisdiction exists is a question of law over which an appellate court's scope of review is unlimited. *Harsch v. Miller*, 288 Kan. 280, 286, 200 P.3d 467 (2009); *Flores Rentals v. Flores*, 283 Kan. 476, 480, 153 P.3d 523 (2007). Exercising this review, an appellate court has a duty to dismiss an appeal when the record discloses a lack of jurisdiction. *Flores*, 283 Kan. at 480; *Max Rieke & Brothers, Inc. v. Van Deurzen & Assocs.*, 34 Kan. App. 2d 340, 342-43, 118 P.3d 704 (2005).

### Appellate Jurisdiction

Appellate jurisdiction is defined by statute; the right to appeal is neither a vested nor a constitutional right. The only reference in the Kansas Constitution to appellate jurisdiction demonstrates this principle, stating the Kansas Supreme Court shall have "such appellate jurisdiction as may be provided by law." Kan. Const., art. 3, § 3. Under this provision, this court may exercise jurisdiction only under circumstances allowed by statute; this court does not

have discretionary power to entertain appeals from all district court orders. See *Meddles v. Western Power Div. of Central Tel. & Utilities Corp.*, 219 Kan. 331, 333, 548 P.2d 476 (1976); *Henderson v. Hassur*, 1 Kan. App. 2d 103, 105-06, 562 P.2d 108 (1977).

As part of the Kansas Legislature's desire to reduce the chances of piecemeal appeals, it limited civil appeals to certain circumstances. See K.S.A. 2009 Supp. 60-2102. As discussed in *Flores*, these legislative categories of appeal include: (1) final decisions and certain court orders under K.S.A. 2009 Supp. 60-2102(a) and (b), which are of right, and (2) interlocutory appeals under K.S.A. 2009 Supp. 60-2102(c), which require findings that are within the discretion of a district court, and acceptance of the appeal by the Court of Appeals, which is a determination within its discretion. *Flores*, 283 Kan. at 481. The legislature has not authorized parties to "unilaterally appeal from any or all orders of the district court in the middle of litigation with the hope, perhaps vain, that the appellate court will ultimately decide that the order is indeed properly appealable." *Harsch*, 288 Kan. at 287; see *Johnson v. Johnson*, 219 Kan. 190, 193, 547 P.2d 360 (1976) (Supreme Court has exclusive responsibility of determining whether its jurisdiction has been properly invoked).

The first of the statutorily recognized categories for an appeal—those authorized by K.S.A. 2009 Supp. 60-2102(a)(4) and (b) as a matter of right—allows an appeal from a "final decision." The term "final decision" has been construed to mean " 'one which finally decides and disposes of the entire merits of the controversy, and reserves no further questions or directions for the future or further action of the court.' " *Gulf Ins. Co. v. Bovee*, 217 Kan. 586, 587, 538 P.2d 724 (1975). Here, the parties do not dispute that the district court's discovery order is not a "final" order in the sense of disposing of the entire merits of the underlying malpractice action. Likewise, we can reach no other conclusion because a discovery order is not a final disposition of the medical malpractice action. See, *e.g.*, *Cimarex Energy Co. v. Board of Seward County Comm'rs*, 38 Kan. App. 2d 298, 303, 164 P.3d 833 (2007) (discovery order issued by Board of Tax Appeals in equalization proceeding was not a final order on the merits of the proceeding); 15B

Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3914.23, p. 123 (2d ed. 1992) ("[T]he rule remains settled that most discovery rulings are not final."). Neither is it an order specified as appealable under K.S.A. 2009 Supp. 60-2102(a)(1), (2), and (3). Consequently, KaMMCO's appeal does not fall under K.S.A. 2009 Supp. 60-2102(a).

As to the second of the statutorily recognized categories for an appeal—an interlocutory appeal governed by K.S.A. 2009 Supp. 60-2102(c)—KaMMCO failed in its attempt to obtain interlocutory certification in the district court. An interlocutory appeal is not an appeal of right; rather, it is subject to the court's discretion and an order denying a request for interlocutory appeal is not itself an appealable order. Consequently, the district court's decision to deny interlocutory certification is not before this court for consideration as a basis of jurisdiction. See *Harsch*, 288 Kan. at 289-90 (discussing nonappealable order); *Reed v. Hess*, 239 Kan. 46, 53-54, 716 P.2d 555 (1986) (discovery orders are generally deemed interlocutory and thus nonappealable by the parties as interlocutory appeals; review of pretrial discovery orders has generally been denied because they can be effectively reviewed after final judgment); see also *United States v. Fei Ye*, 436 F.3d 1117, 1122 (9th Cir. 2006) (stating that discovery orders are generally interlocutory and nonappealable).

Hence, KaMMCO's appeal is not authorized on either of these procedure grounds, leading KaMMCO to assert the collateral order doctrine as a basis for the appeal.

## Collateral Order Doctrine

The collateral order doctrine was recognized by the United States Supreme Court as a "very narrow exception" to the final order requirement. *Flores*, 283 Kan. at 481-82; see *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468-69, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978); *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949). Federal statutes, like those in Kansas, grant appellate jurisdiction over "final decisions of the district courts." 28 U.S.C. § 1291 (2006). However, the United States Supreme Court has determined that § 1291 allows appellate courts

to reach "not only judgments that 'terminate an action,' but also a 'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.' [Citation omitted.]" *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 106, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009).

Kansas has adopted the United States Supreme Court's collateral order doctrine. As that doctrine is applied in Kansas, to be collaterally appealable, the order must " '(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment.' [Citation omitted.]" *Flores*, 283 Kan. at 482. The collateral order doctrine is applied sparingly in Kansas, and the policy of limiting categories of appeals is reflected in the *Flores* court's holding that "[t]here is no sound policy to liberalize the [collateral order] doctrine, especially when the opportunity exists for an interlocutory appeal if the Court of Appeals is persuaded, in the exercise of its discretion, to allow the appeal. [Citation omitted.]" *Flores*, 283 Kan. at 490. More recently, in *Harsch*, 288 Kan. at 290, this court emphasized that a party is in a risky position when relying on the collateral order doctrine.

Recently, in *Mohawk Industries, Inc.*, 558 U.S. at 103, the United States Supreme Court considered whether the collateral order doctrine applied to an appeal from discovery orders that were arguably adverse to the attorney-client privilege and held such orders do not qualify for immediate appeal under the collateral order doctrine. The Court determined that "[p]ostjudgment appeals, together with other review mechanisms, suffice to protect the rights of litigants and preserve the vitality of the attorney-client privilege." *Mohawk*, 558 U.S. at 103. Hence, the Court refused to apply the collateral order doctrine. The decision provides at least some guidance for this court in the present case.

In *Mohawk*, the underlying dispute arose when Carpenter sued his former employer, Mohawk, claiming that the company fired him after it failed to force his silence about the company's alleged hiring of undocumented immigrants. A key feature of Carpenter's allegation involved a discussion he had with Mohawk's counsel, and

Carpenter filed a motion in the district court to compel disclosure of information about that meeting. Mohawk maintained that the requested information was protected by the attorney-client privilege. The district court agreed that the privilege applied, but it also determined that Mohawk had implicitly waived the privilege through its representations in a class action suit against Mohawk that also concerned the hiring of undocumented workers.

Mohawk filed a notice of appeal and a petition for a writ of mandamus in the Eleventh Circuit Court of Appeals. The Eleventh Circuit dismissed the appeal for lack of jurisdiction under 28 U.S.C. § 1291, holding that the district court's ruling did not qualify as an immediately appealable collateral order. *Carpenter v. Mohawk Industries, Inc.*, 541 F.3d 1048, 1052 (11th Cir. 2008).

The United States Supreme Court agreed with the federal circuit court, explaining that the decisive consideration is whether delaying review until the entry of final judgment " 'would imperil a substantial public interest' or 'some particular value of a high order.' " *Mohawk*, 558 U.S. at 106 (quoting *Will v. Hallock*, 546 U.S. 345, 352-53, 126 S. Ct. 952, 163 L. Ed. 2d 836 [2006]). In making this determination, the Court looked not to the " 'individualized jurisdictional inquiry' " but to " 'the entire category to which the claim belongs.' " *Mohawk*, 558 U.S. at 107 (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868, 114 S. Ct. 1992, 128 L. Ed. 2d 842 [1994], and *Coopers & Lybrand*, 437 U.S. at 473).

The Supreme Court observed that it routinely requires litigants to wait until after final judgment to vindicate valuable rights, including rights central to our adversarial system. See, *e.g., Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 426, 105 S. Ct. 2757, 86 L. Ed. 2d 340 (1985) (holding an order disqualifying counsel in a civil case did not qualify for immediate appeal under the collateral order doctrine); *Flanagan v. United States*, 465 U.S. 259, 260, 268, 104 S. Ct. 1051, 79 L. Ed. 2d 288 (1984) (reaching the same result in a criminal case, notwithstanding the Sixth Amendment to the United States Constitution rights at stake).

With regard to the attorney-client privilege, the Supreme Court rejected Mohawk's contention that the right to maintain attorney-

client confidences would be "irreparably destroyed" unless adverse privilege rulings are immediately appealable. *Mohawk*, 558 U.S. at 108. Recognizing the importance of the privilege, the *Mohawk* Court stated: "The crucial question, however, is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*, 558 U.S. at 108. The Court concluded the likely "institutional costs" of bringing privilege-related orders under the framework of the collateral order doctrine outweigh any potential benefits. *Mohawk*, 558 U.S. at 112. The Court expressed concern that if it approved collateral order appeals in the context of confidentiality or privilege many more litigants "would also likely seek to extend such a ruling to disclosure orders implicating many other categories of sensitive information, raising an array of line-drawing difficulties." *Mohawk*, 558 U.S. at 113; see also *Addison v. State*, 173 Md. App. 138, 160, 917 A.2d 1200 (2007) (the idea that an issue is not effectively reviewable after termination of trial, as element for immediate appeal of interlocutory order under common-law collateral order doctrine, because it involves a "right" to avoid the trial itself, should be limited to double jeopardy claims and very few other extraordinary situations; otherwise, there would be a proliferation of appeals under the collateral order doctrine).

The *Mohawk* Court pointed out that appellate courts can remedy the improper disclosure of privileged material in the same way they remedy other erroneous evidentiary rulings—by vacating an adverse judgment and remanding for a new trial in which "the protected material and its fruits are excluded from evidence." *Mohawk*, 558 U.S. at 109. Responding to Mohawk's assertion that ordering disclosure of privileged information encroaches on the confidentiality of attorney-client communications, the Court stated that "deferring review until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel." *Mohawk*, 558 U.S. at 109. The Court found no "discernible chill" is likely.

Further, the *Mohawk* Court noted that a collateral order appeal is not the only method of seeking relief: (1) a party may ask the

district court to certify, and the Court of Appeals to accept, an interlocutory appeal, and (2) in extraordinary circumstances, a party may petition an appellate court for a writ of mandamus. "Another long-recognized option," stated the Court, "is for a party to defy a disclosure order and incur court-imposed sanctions." *Mohawk*, 558 U.S. at 111. In concluding that sufficiently effective review of adverse attorney-client privilege rulings can be had without resort to the collateral order doctrine, the Court reiterated that the class of collaterally appealable orders must remain " 'narrow and selective in its membership.' [Citation omitted.]" *Mohawk*, 558 U.S. at 113.

Turning to consideration of these principles in this case, the analysis in *Mohawk* is helpful in considering KaMMCO's assertion that Allen seeks privileged or confidential information, including information protected under K.S.A. 2009 Supp. 60-226(b) (work product), K.S.A. 2009 Supp. 60-226(c)(7) (trade secret or other confidential research, development, or commercial information), K.S.A. 60-426 (attorney-client privilege), K.S.A. 2009 Supp. 60-427 (physician-patient privilege), K.S.A. 2009 Supp. 65-4915 (peer review privilege), and common-law qualified privileges. Yet, there is one significant difference between this case and the facts of *Mohawk*. Specifically, unlike the defendant asserting discovery errors in *Mohawk*, KaMMCO is a nonparty to the underlying lawsuit. Consequently, it is possible that KaMMCO would have no redress on direct appeal of the final outcome of the medical malpractice action. *Cf. Com. v. Makara*, 980 A.2d 138, 140-41 (Pa. Super. 2009) (discovery orders involving privileged information of third party were appealable as collateral to the principal action; court order granting defendant's motion seeking disclosure of counseling and educational records of two minor victims was immediately appealable as a collateral order in prosecution for sexual abuse of children).

Other courts have determined, however, that a nonparty attempting to appeal an order, not a final judgment, can only obtain a remedy via mandamus. See, *e.g.*, *In re Bain*, 144 S.W.3d 236, 239 (Tex. App. 2004) (applying proposition that a nonparty may obtain relief from a district court order by way of petition for writ

of mandamus to discovery order). An exception to this view has been recognized by the Tenth Circuit Court of Appeals when an order is collateral, separable from the main litigation and related to an injured nonparty but only " '[w]hen and if a subsequent order of the court imposes a harmful sanction.' [Citation omitted.]" *United States v. Feeney*, 641 F.2d 821, 824 (10th Cir. 1981); see also *United States v. Ryan*, 402 U.S. 530, 532, 29 L. Ed. 2d 85, 91 S. Ct. 1580 (1971) ("[O]ne to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey.").

While none of these authorities controls our consideration of the application of the collateral order doctrine, the analysis and policy expressed are consistent with the Kansas analysis of interlocutory appeals and the collateral order doctrine. First, Kansas has a clear policy to avoid piecemeal appeals. Second, our recent case law emphasizes the limited availability of the collateral order doctrine. Third, we have generally followed the United States Supreme Court's application of the collateral order doctrine. Finally, even if we were to adopt the line of demarcation recognized by the Tenth Circuit Court of Appeals, that line of demarcation would not apply in this case because no sanction or penalty has been imposed. (Hence, we need not decide if we accept this line of demarcation.) In light of those considerations, we find the Supreme Court's rejection in *Mohawk* of the application of the collateral order doctrine under circumstances involving the discovery of attorney-client privileged information to be persuasive in the context of this case. We, therefore, conclude that discovery orders that do not impose a sanction on a nonparty do not qualify for appeal under the collateral order doctrine even if the order is potentially adverse to a claim of privilege. Therefore, the district court's discovery order was not immediately appealable pursuant to K.S.A. 2009 Supp. 60-2102.

Case No. 102,164 is dismissed for lack of jurisdiction.

## Mandamus Proceeding

In addition to filing a collateral order doctrine appeal from the district court's discovery order, KaMMCO filed a petition for writ of mandamus, an alternative avenue of protection mentioned with approval in the Supreme Court's discussion in Mohawk. KaMMCO argues mandamus is appropriate because it is facing "irreparable harm" and because it is a nonparty to the underlying case that is left without recourse on direct appeal.

Allen responds that KaMMCO's irreparable harm argument is unpersuasive in that another nonparty, the Kansas Health Care Stabilization Fund (the Fund), under virtually identical discovery orders, underwent similar discovery—a corporate representative of the Fund having been deposed—without the disclosure of privileged or confidential information. Allen states that she was able to successfully discover evidence of potential bias and financial interests shared by Dr. Slater and Dr. Macy without causing irreparable harm to the Fund. Factually, this argument is dependent on matters outside our record; while the record includes the subpoena duces tecum served on the Fund and the Fund's motion to quash, it does not contain information to allow us to evaluate whether privileged information was disclosed. We, therefore, cannot rely on this argument as a basis for our ruling. Nevertheless, Allen also raises legal arguments. Specifically, she argues that mandamus is inappropriate because the discovery order involves the district court's discretionary role and, alternatively, because an order of mandamus would be premature since the district court has not conducted an in camera inspection of the allegedly privileged or confidential information.

The legal context for these arguments begins with the Kansas Constitution, which provides this court with original jurisdiction for proceedings in mandamus. Kan. Const. art. 3, § 3. In addition, K.S.A. 60-801 provides: "Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law."

Because this provision is limited to performance of a "duty," generally, as Allen suggests, a district court's discretion cannot be controlled by mandamus. She is further correct in noting that ordinarily "[c]ontrol of discovery is entrusted to the sound discretion of the district court, and orders concerning discovery will not be disturbed on appeal in the absence of clear abuse of discretion. [Citations omitted.]" *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 704, 952 P.2d 1286 (1998).

However, as previously noted, the *Mohawk* Court recognized mandamus as a potential remedy under some circumstances when a claim of privilege has been raised during discovery. The same conclusion has been reached by this court in several cases recognizing that, although a district court's discretion cannot be controlled by mandamus, mandamus may be invoked where an order of the district court denies a right or privilege which exists as a matter of law, and there is no remedy by appeal. *E.g.*, *S.M. v. Johnson*, 290 Kan. 11, 13-14, 221 P.3d 99 (2009); *Wesley Medical Center v. Clark*, 234 Kan. 13, 16, 669 P.2d 209 (1983); *Berst v. Chipman*, 232 Kan. 180, 183, 653 P.2d 107 (1982); *Nunn v. Morrison*, 227 Kan. 730, Syl. ¶ 1, 608 P.2d 1359 (1980); *Hulme v. Woleslagel*, 208 Kan. 385, 388, 493 P.2d 541 (1972).

Both parties discuss *Berst*, 232 Kan. 180, at length. In *Berst*, the National Collegiate Athletic Association (NCAA), a nonparty, filed a petition claiming it had a protectable interest in maintaining the confidentiality of its private investigation into possible rule infractions. An Alabama newspaper sought discovery of this information to aid in its defense of a libel suit. This court recognized the NCAA as a voluntary organization whose self-policing function was to enforce NCAA regulations. *Berst*, 232 Kan. at 184. The NCAA argued that confidentiality was central to its success as a self-policing system and that a loss of confidentiality in its investigative files and identities of sources would destroy that system. The NCAA sought a protective order, arguing the discovery request was overly broad, the requested documents were not relevant to the libel action, and the information in the documents was confidential. After conducting a hearing but without conducting an in camera review of the documents, the district court denied the protective order.

This court, in considering the petition for writ of mandamus, recognized that, "where an order of the trial court denies a litigant a right or privilege which exists as a matter of law, and there is no remedy by appeal, mandamus may be invoked." *Berst*, 232 Kan. at 183. The court also noted another exception to the general rule that a trial court's discretion cannot be controlled by mandamus; that exception applies "where a petition for mandamus presents an issue of great public importance and concern." *Berst*, 232 Kan. at 183. The *Berst* court found that both exceptions applied to the NCAA's petition. As to the privilege exception, the court stated: "The petitioners would not have a remedy by appeal as the information sought would irretrievably have been disclosed prior to the time in which an appeal could be taken." *Berst*, 232 Kan. at 183.

Focusing on the *Berst* court's discussion of the exceptions, Allen at least implies that KaMMCO's mandamus action should not be allowed because KaMMCO has not argued that the issue in controversy is of "great importance." This argument is somewhat belied by her counsel's statements that attorneys are "vitally interested" in this issue. More critically, however, *Berst* does not limit the availability of mandamus to actions of great importance; rather, the court in *Berst* recognized the issue-of-great-importance route as one path for invoking mandamus jurisdiction. KaMMCO relies on the alternative route—*i.e.*, the denial of a legal right or privilege that cannot be remedied on appeal. *Berst*, 232 Kan. at 183; see *Wesley Medical Center*, 234 Kan. at 16.

In this case, KaMMCO asserts that it should not be burdened with complying with discovery that is not relevant to the underlying suit, especially when doing so would cause irreparable harm by allowing confidential or privileged information to be disclosed. Further, because KaMMCO is not a party to the medical malpractice action, it would have no ability to seek review of the order on appeal from the final judgment. Therefore, we conclude that mandamus is an available remedy and that we have jurisdiction to proceed.

## MANDAMUS REMEDY

Having determined that mandamus is an available remedy, we now consider whether it is an appropriate remedy.

*Standard for Relief*

As we turn to the specifics of the propriety of the discovery order, "[t]he burden of showing a right to the relief sought is on the petitioner. Unless the respondent's legal duty is clear, the writ should not issue." *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 410, 197 P.3d 370 (2008). " 'Whether mandamus lies is dependent upon an interpretation of the applicable procedural and substantive statutes, over which this court has unlimited review.' [Citations omitted.]" *State ex rel. Slusher v. City of Leavenworth*, 285 Kan. 438, 443, 172 P.3d 1154 (2007).

In attempting to establish its right to relief, KaMMCO argues that Allen failed to establish that the information she seeks is reasonably calculated to lead to admissible evidence and the district court did not comply with the procedures enunciated in *Berst*, 232 Kan. 180, and subsequent cases dealing with discovery served on third parties.

*Duties and Considerations Imposed by Berst*

As KaMMCO suggests, the *Berst* decision guides our analysis. In *Berst*, after having found that the NCAA could seek the mandamus, the *Berst* court turned its consideration to the language of 60-226(b), which defines the scope of discovery, stating that discovery is allowed of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." K.S.A. 2009 Supp. 60-226(b)(1). The *Berst* court noted that the scope of relevancy in a discovery proceeding is broader than the scope of relevancy at trial. *Berst*, 232 Kan. at 186 (*citing Gleichenhaus v. Carlyle*, 226 Kan. 167, 170, 597 P.2d 611 [1979]). "It is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." K.S.A. 2009 Supp. 60-226(b)(1).

After conducting its own in camera review of the documents, the *Berst* court concluded that many of the documents in the NCAA's file did "not relat[e] in any way to the litigants or the issues involved" in the lawsuit. *Berst*, 232 Kan. at 186. Because the irrelevant documents should have been excluded by limiting discovery,

the *Berst* court concluded that the district court erred in failing to conduct an in camera inspection to determine which documents were not relevant, stating: "We believe when a claim of privilege, confidentiality or irrelevance is raised the court has a *duty* to conduct an in camera inspection to separate and permit discovery of only the relevant documents, thereby protecting against unnecessary and damaging disclosure of irrelevant confidential material." (Emphasis added.) *Berst*, 232 Kan. at 187.

The *Berst* court then focused on whether the relevant documents were confidential. Noting that the NCAA's documents did not come within any privilege created by statute, the *Berst* court recognized the existence of a privilege is not necessary in order to limit discovery. Rather, a court can limit discovery pursuant to its general supervisory powers over discovery. The court cited to 60-226(c), which provides that a district court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." K.S.A. 2009 Supp. 60-226(c). Under this statutory provision, the *Berst* court indicated that a balance must be struck between discovery and nondisclosure, considering several factors, such as " 'the nature of the proceeding, whether the deponent is a party, whether the information sought is available from other sources, and whether the information sought goes to the heart of the claim.' " *Berst*, 232 Kan. at 188 (quoting *Richards of Rockford, Inc. v. Pacific Gas & Elec.*, 71 F.R.D. 388, 390 [N.D. Cal. 1976]). In addition to this list of factors, the *Berst* court discussed other factors, including "the degree of harm that would be caused by disclosure and the type of controversy before the court" as well as the public interest in protecting confidentiality of the particular documents. *Berst*, 232 Kan. at 189 (citing 4 Moore's Federal Practice ¶ 26.60[3] [1970]; *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249, 250 [D.C. Cir. 1970], *aff'd* 479 F.2d 920 [D.C. Cir. 1973]); see also 8 Wigmore, Evidence § 2285 (McNaughton rev. 1961) (identifying four fundamental conditions necessary to establish a qualified privilege against disclosure of confidential communications).

With regard to the relevant documents in the NCAA's file, this court found the confidential nature of the information—informa-

tion which went to the "very essence" or "heart" of the issues in the libel case—was outweighed by the fact that this information would result in a fair determination of the underlying case. Even in those circumstances a further duty exists, however. The *Berst* court explained that when a district court orders production of confidential records, "it has a duty to limit the availability and use of documents" by utilizing protective provisions. *Berst*, 232 Kan. at 187.

Hence, although recognizing the district court's discretion when supervising the course of discovery and determining its scope, the *Berst* court imposed several duties. In summary, these duties are:

1. "[W]hen a claim of privilege, confidentiality or irrelevance is raised the court has a duty to conduct an in camera inspection to separate and permit discovery of only the relevant documents, thereby protecting against unnecessary and damaging disclosure of irrelevant confidential material." *Berst*, 232 Kan. at 187.

2. Once a determination of relevance is made, if there is an objection that the documents are confidential or privileged, it must be determined whether the objection is valid. *Berst*, 232 Kan. at 187.

3. The court should exercise its general supervisory powers over discovery and apply K.S.A. 2009 Supp. 60-226(c) by making "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." When resolving disputes regarding whether discovery would cause annoyance, embarrassment, oppression, or undue burden or expense, a district court should weigh factors such as the nature of the proceeding, whether the discovery is requested from a party, whether the information that is sought is available from other sources, whether the information sought goes to the heart of the claim, the degree of harm that would be caused by disclosure, the type of controversy before the court, and the public interest in protecting confidentiality of a particular document or information. *Berst*, 232 Kan. at 187-90.

4. If confidential or privileged documents are ordered to be produced, the district court has a duty to limit the availability and use

of documents by utilizing protective provisions. *Berst*, 232 Kan. at 187.

Our next task is to examine the district court's performance or failure to perform these duties.

## 1. *Scope of Discovery*

The first of these duties—to separate and permit discovery of only the relevant documents—is triggered because KaMMCO has clearly and repeatedly asserted claims of confidentiality and privilege as well as relevance. As discussed in *Berst*, in the context of a discovery request the test of relevancy is whether "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." K.S.A. 2009 Supp. 60-226(b)(1). The district court did not discuss this test in its findings, and we can find no ruling to the effect that the information Allen seeks is within the scope of discovery as defined in K.S.A. 2009 Supp. 60-226(b)(1). At oral argument, Allen's counsel was questioned about the lack of a ruling; counsel responded that the district court made such a ruling during a telephone conference. Even with this guidance, we are still unable to locate an explicit finding by the district court.

Even if the failure to locate the ruling is due to our lack of detective skills, the fault lies with Allen who had an obligation to provide a record citation for this critical finding that is the foundation for her arguments. As it would relate to Allen's briefing of Case No. 102,164, she was required by Supreme Court Rule 6.02 (2010 Kan. Ct. R. Annot. 38) to provide a specific citation to the record. See Supreme Court Rule 6.02(d) (2010 Kan. Ct. R. Annot. 39) (Facts must "be keyed to the record on appeal by volume and page number so as to make verification reasonably convenient. Any material statement made without such a reference may be presumed to be without support in the record."); see also Supreme Court Rule 6.02(e) (2010 Kan. Ct. R. Annot. 39) ("Each issue shall begin with citation to the appropriate standard of appellate review and a reference to the specific location in the record on appeal where the issue was raised and ruled upon."); *Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1275, 221 P.3d 588 (2009) (party asserting an argument has the responsibility for

providing a record on appeal sufficient to support the argument). Because Allen had the obligation to comply with these rules in Case No. 102,164, we think it fair to apply them in this mandamus action that was consolidated with that appeal. Consequently, we presume that district court did not rule on the issue of relevancy.

Counsel suggests that even if there was not an explicit relevancy ruling, we could accept the analysis that is implicit in the district court's order, *i.e.*, that all categories of records sought in the subpoena are within the scope of discovery allowed by K.S.A. 2009 Supp. 60-226(b). Allen thus asks us to rule that all materials from KaMMCO are discoverable because they show a potential financial interest by Dr. Macy. Accepting that Dr. Macy and Dr. Slater are not members of the same member-owned insurance company, Allen, in her "Response to Petition for Writ of Mandamus," argues that both Dr. Slater and Dr. Macy, as Kansas physicians, must choose from the same pool of insurance coverage that would be impacted by a verdict in this case. She further suggests that she needs all of the evidence regarding KaMMCO in order to combat any assertion by the defense at trial insinuating that Kansas expert witnesses, as opposed to out-of-state witnesses, are more credible. On the flip side, KaMMCO suggests that we can determine that none of the records satisfy the scope of discovery test of K.S.A. 2009 Supp. 60-226(b).

Ultimately, we conclude we are unable to make the blanket rulings that either party seeks. We suffer from the same malady that led to the apparent frustration of the district court: shifting theories of relevancy and lack of specificity of objections. Both parties' shotgun approach makes for a scattered analysis and leaves many gaps between pellet holes. We will attempt to address the scattered arguments within the framework of the *Berst* duties but must remand to the district court for further clarification and development on some issues.

### a. *Overarching Theory of Bias*

First, we will address Allen's overarching argument as to why all of the records it seeks from KaMMCO are discoverable because of the potential to show Dr. Macy's bias and KaMMCO's argument

that none of the records are discoverable. As we have discussed, in initially stating how the subpoena requests were reasonably calculated to lead to the discovery of admissible evidence, Allen relied on Dr. Slater's and Dr. Macy's shared financial interest as members of the same member-owned insurance company, otherwise known as a mutual insurance company. Once discovery revealed this link lacked a factual basis, Allen shifted its focus to KaMMCO's "aggressive" claims practices. Then Allen again asserted a financial interest, albeit more attenuated, because both physicians must purchase insurance from Kansas insurance carriers whose premiums are likely to be impacted by jury verdicts. We will begin our analysis by examining whether this financial link, as a matter of law, is material to the issue of witness bias, in other words whether it is reasonably calculated to lead to admissible evidence. See *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010) (materiality of evidence presents question of law).

In general, evidence of bias is always relevant, as is evidence that a witness bears a prejudice, hostility, or improper motive. *State v. Ross*, 280 Kan. 878, 886, 127 P.3d 249, *cert. denied* 548 U.S. 912 (2006); see also *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 315, 607 P.2d 1339 (1980) (evidence of bias or prejudice of witness is relevant and may be shown on cross-examination, in rebuttal, or by other witnesses or evidence); *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome.").

Our recognition of these general principles leaves us with the question of whether it is evidence of bias that Dr. Macy, the defense expert, is insured by a company that is the servicing carrier for Dr. Slater's insurance plan. Clearly, Allen would have a stronger argument if, as initially believed, Dr. Slater and Dr. Macy were both insured by the same member-owned insurance company. Even then, we would be faced with two potentially conflicting principles. First is the general principle that Allen should be able to develop and discover evidence of Dr. Macy's bias. See K.S.A. 60-420 (evidence of credibility admissible). Second, however, are general principles aimed at preventing the mention of insurance if

doing so raises the implication that an insurance company will be paying damages. These principles are applicable because, if Allen is allowed to impeach Dr. Macy with evidence he was a member of a member-owned insurance company, the evidence would have the simultaneous effect of announcing that Dr. Slater has liability insurance. As such, K.S.A. 60-454 comes into play. It provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible as tending to prove negligence or other wrongdoing."

K.S.A. 60-454 deviates from the federal rule of evidence and the rule as adopted in many states, which begins with the sentence found in K.S.A. 60-454 but also addresses the potential for admitting evidence of insurance to establish bias or for other purposes the rule specifies. For example, the federal rule continues by stating: "This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness." Fed. R. Evid. 411. Nevertheless, without discussion of the difference in Kansas' rule and the federal provision or the lack of the specific authorization for evidence of insurance to show bias, this court found no reversible error in disclosing the existence of liability insurance to show witness interest or bias in *State Farm Fire & Casualty Co. v. Hornback*, 217 Kan. 17, 535 P.2d 441 (1975). In that case, a fire insurer's subrogation action against defendant tenants, a witness who testified for the tenants as to the cause of the fire was the liability insurance agent who sold the policy. The court recognized that under those circumstances the collateral mention of insurance was necessary to establish the possible bias on the part of the witness.

Applying such a view (usually in the context of an explicit statutory or rule provision like Fed. R. Evid. 411), other jurisdictions have considered the question of whether evidence that an expert witness is a member of the *same* member-owned insurance company as a defendant may be admitted at trial. Before us, Allen does not cite to these cases as support for her argument and, more critically, does not cite any factually similar case where the de-

fendant physician and the expert witness were not members of the same insurance company. Nevertheless, we find some guidance in the cases dealing with members of the same insurance company.

In considering that situation, most jurisdictions apply what has become characterized as a "connections test" or a "substantial connections test." "The substantial connection analysis looks to whether a witness has 'a sufficient degree of "connection" with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness.' " *Bonser v. Shainholtz*, 3 P.3d 422, 425 (Colo. 2000) (quoting *Otwell v. Bryant*, 497 So. 2d 111, 115 [Ala.1986]). The Alabama Supreme Court first mentioned a "connections" analysis in *Otwell*, 497 So. 2d at 113.

*Otwell* was a medical malpractice case in which the plaintiff attempted to introduce evidence that two defendant physicians and three of the defendants' physician expert witnesses were members of the same "mutual assurance" company. The district court refused to admit the evidence, and the Alabama Supreme Court affirmed, holding:

"What is missing in the present case is the sufficient degree of 'connection.' The coincidental fact that the witness and the defendants are both insured by [the same mutual assurance company] is not an adequate degree of connection to counter-balance the undue prejudice that will result to the defendants through alerting the jury to the existence of liability insurance." *Otwell*, 497 So. 2d at 114.

The rationale was further explained in *Mendoza v. Varon*, 563 S.W.2d 646, 649 (Tex. Civ. App. 1978), another medical malpractice case. The court stated:

"[T]he [expert] witness had no direct interest in the outcome of the litigation, as would an agent, owner or employee of the defendant's insurer. While it is true that a large judgment against any doctor will probably affect the insurance rates of other physicians, this interest is remote, and any proof of bias based upon that interest is outweighed by the prejudice caused by informing the jury of the defendant's insurance protection." *Mendoza*, 563 S.W.2d at 649.

Other jurisdictions have reached the conclusion that evidence of both physicians being members of the same mutual insurance company is not admissible, without a showing of a substantial connection between the expert and the company. See, *e.g.*, *Barsema v.*

*Susong*, 156 Ariz. 309, 313, 751 P.2d 969 (1988) ("[W]e acknowledge that in dealing with a captive insurer . . . with a comparatively small premium pool, evidence of a common insurer between the witness and the defendant might be more relevant than in ordinary cases. Nonetheless, . . . [i]n all but the exceptional case, a trial judge applying Rule 403 should hold that the danger of prejudice resulting from the interjection of insurance evidence substantially outweighs the probative value of evidence that the witness and a party have a common insurer. In all but exceptional cases, therefore, the type of evidence that concerns defendant would not be admitted."); *Hawes v. Chua*, 769 A.2d 797, 810-11 (D.C. 2001) (commonality of insurance company insufficient in absence of proffer of substantial connection such as showing that expert is agent of insurer); *Chambers v. Gwinnett Community, Inc.*, 253 Ga. App. 25, 28, 557 S.E.2d 412 (2001) ("[A] party must demonstrate a more substantial connection than simply a common mutual insurance carrier to overcome the potentially prejudicial effect of introducing evidence of a defendant's insurance."); *Wells v. Tucker*, 997 So. 2d 908, 917 (Miss. 2008) (trial court did not abuse discretion in excluding evidence of common insurance carrier, noting strong policy to not interject insurance into trial); *Reimer v. Surgical Servs. of the Great Plains*, 258 Neb. 671, 676, 605 N.W.2d 777 (2000) (plaintiffs "presented no evidence of bias other than the mere fact that [the defendant] and his expert were policyholders of insurance issued by the same carrier. Absent other facts to indicate bias, the facts of the instant case indicate only a remote possibility of bias"); *Warren v. Jackson*, 125 N.C. App. 96, 101, 479 S.E.2d 278 (1997) (mere policyholder status represents too attenuated a "connection" with an insurance company, mutual or otherwise, for the probative value of such evidence to outweigh the potential prejudice to jury's deliberations); *Mills v. Grotheer*, 957 P.2d 540, 543 (Okla. 1998) (unless it is shown that witness has substantial connection with business of the common insurer, there is no basis for discrediting testimony based on bias derived from interest in common insurer's business); *Patton v. Rose*, 892 S.W.2d 410, 415 (Tenn. App. 1994) (plaintiff unsuccessfully sought to cross-examine one of defendant physician's expert witnesses regarding the fact that the expert was

insured by same insurance company). Only the Ohio Supreme Court has taken a different view, adopting a per se rule that commonality of coverage is admissible to prove bias in a medical malpractice case. See *Ede v. Atrium South OB-GYN, Inc.*, 71 Ohio St. 3d 124, 128, 642 N.E.2d 365 (1994).

These cases uniformly undercut Allen's blanket argument that all of the requested information is reasonably calculated to lead to admissible evidence of financial bias. This is especially true since the cases applying the substantial interest test are at least one step removed from the situation presented in this case because those cases involve members of the same insurance company whereas Dr. Slater and Dr. Macy are insured by different companies. Hence, even Ohio's per se commonality of coverage standard would not apply. Under any of these cases, without a membership connection between KaMMCO and Dr. Slater, Dr. Macy's membership in KaMMCO, by itself, would not be admissible evidence or serve as a door to open access to the admission of a wide range of KaMMCO documents.

The lack of membership connection makes this case analogous to a line of Kansas cases in which attorneys sought to determine juror bias by asking jurors during voir dire whether they were members of or stockholders in insurance companies. Uniformly, this court condemned this practice. For example, in *Powell v. Kansas Yellow Cab Co.*, 156 Kan. 150, Syl. ¶ 4, 131 P.2d 686 (1942), this court held it is reversible error in a personal injury action in which an insurance company is not a party to ask jurors on their voir dire if they are stockholders or directors in an insurance company. In addition, the court held: "[I]t is gross misconduct for counsel for plaintiff, in examining jurors on their voir dire, to ask any question which indicates defendant will not have to pay a judgment rendered for plaintiff but that some insurance company is bound to pay it." *Powell*, 156 Kan. 150, Syl. ¶ 3.

Obviously, these cases are not directly on point. They do reflect, however, Kansas' long-standing position that insurance should not be interjected in a trial. Further, they reject arguments that the financial connection of buying insurance in the same market or even having a joint ownership interest in an insurance company is

a bias that would disqualify a potential juror or is of the nature that warrants interjection of insurance into a liability trial.

While these cases are helpful to our analysis, this case presents a different question. Here the question is whether to allow discovery rather than whether to admit evidence of insurance or allow discussion of insurance during a trial. As we have repeatedly noted, the relevancy test for discovery is not whether evidence will be admissible at trial, but whether it is reasonably calculated to lead to the discovery of admissible evidence. Even so, courts have extended the substantial connections test to the discovery setting and have limited discovery, at least when a nonparty is involved. See, *e.g., Ex parte Morris*, 530 So. 2d 785, 789 (Ala. 1988) (discovery sought was malpractice witnesses' income tax returns; court relied on *Otwell*'s substantial connection test).

The rationale of these cases that limit discovery is not unlike that applied by this court in *Berst* and in *Jones v. Bordman*, 243 Kan. 444, 759 P.2d 953 (1988). As previously discussed, in *Berst*, the court directed a district court to consider its authority under K.S.A. 60-226(c) to enter orders limiting discovery after weighing various factors. Similar direction was given in *Jones*.

*Jones* was an interlocutory appeal arising from discovery orders related to requests for information intended to prove bias and prejudice on the part of a defense expert witness, Dr. Joseph Lichtor. The plaintiffs sought various documents from Dr. Lichtor, including all medical reports made by the doctor for the past 6 years, the doctor's income tax returns, and a list of all cases in which the doctor served as an expert witness for the defendant's attorneys. The district court denied a motion to quash the subpoena.

On appeal, one of the arguments raised by the plaintiffs pertained to the scope of discovery. The plaintiffs argued that the scope of discovery as defined in K.S.A. 60-226(b) was broad enough to permit the inspection of Dr. Lichtor's records for possible evidence showing bias and prejudice. *Jones*, 243 Kan. at 454. Despite the broad test for permitting discovery, the *Jones* court found the medical records sought by the plaintiffs were inadmissible because the records pertained to persons who were not par-

ties to the action and "as such are not relevant." *Jones*, 243 Kan. at 455. The *Jones* court explained:

"It does not follow that the wholesale discovery of these medical records is permissible because evidence may be discovered which might show bias and prejudice of the witness. . . . The scope of discovery under K.S.A. [2009] Supp. 60-226(b) contemplates the full disclosure of the expert witness' opinion and the facts and basis for that opinion. It does not contemplate the discovery of the medical records of persons not a party to the lawsuit for the sole purpose of obtaining evidence which may show a bias or prejudice." *Jones*, 243 Kan. at 455.

This limitation on discovery suggests it can be appropriate to limit discovery based on what arguably is a broad theory of bias and prejudice. Such a limitation seems particularly appropriate in a case such as this where there seems to be a complete lack of authority for the ultimate admission of the evidence Allen seeks to discover or for authority suggesting the information is material to the issue of bias. The cases from other jurisdictions persuade us that discovery of all the KaMMCO records is not reasonably calculated to lead to the discovery of admissible evidence of bias when the materiality of that evidence is premised on the fact that Dr. Slater and his expert are within the same insurance market or that the expert is a member of the insurance company that is the servicing carrier for Dr. Slater's insurance plan. Consequently, we reject Allen's invitation for us to make a blanket finding that all of the requested documents are discoverable on the basis that KaMMCO's records are reasonably calculated to lead to admissible evidence showing Dr. Macy's bias simply because he and Dr. Slater are Kansas physicians.

b.   *Other Theories of Relevance*

This holding does not mean that some of KaMMCO's records are not discoverable. There are alternative arguments as to why many of the discovery requests are reasonably calculated to lead to admissible evidence. In fact, another broad argument raised by Allen relates to Dr. Macy's potential bias arising from information received from KaMMCO regarding the role of expert witnesses in claims. As recognized in *Jones*, 243 Kan. at 455, K.S.A. 2009 Supp. 60-226(b) allows discovery regarding the basis for an expert opin-

ion. Hence, information received from KaMMCO, although perhaps subject to other objections, could satisfy a relevancy test on the grounds the information may lead to evidence of what influenced Dr. Macy's opinions.

Yet, not all of the discovery demands can be explained by this theory of relevancy. This is where the shotgun approach to argument fails to cover the entire target. We could continue with a paragraph by paragraph analysis of the discovery request and supply our own reasons why a request may or may not be relevant, but the record is simply inadequate for us to go further in evaluating Allen's theories as to why the standard of K.S.A. 2009 Supp. 60-226(b) is met by any of the requests. Similarly, we are unable to link specific relevancy (or, as we discuss later, privilege) objections espoused by KaMMCO to specific paragraphs of the request. This lack of specificity exists even though this discovery dispute spanned almost a year of written arguments and hearings before the district court and then the parties had the opportunity to focus their arguments before us. Given this, we are sympathetic to the obvious frustration of the district court in this matter. Arguably, we could conclude that Allen failed to meet her burden and quash the subpoena on this ground. But this ignores the apparent legitimacy of some of the discovery under the articulated theory that KaMMCO information might serve as a basis for Dr. Macy's opinions. Consequently, rather than quash the entire subpoena based on relevancy, we conclude a remand is necessary.

On remand, if Allen wishes to pursue any of the proposed discovery, she should articulate how each category of requested information is likely to lead to the discovery of admissible evidence. KaMMCO should then raise specific relevancy objections so that the district court can perform the first duty stated in *Berst*—to separate and permit discovery of only relevant documents. If it becomes necessary to review documents in order to fulfill this or other duties imposed in *Berst*, we remind the district court and the parties of the option to use a master. See K.S.A. 2009 Supp. 60-216; K.S.A. 2009 Supp. 60-253.

## 2. Determination of Privileges and Other Objections

The *Berst* court directed that once a determination of relevance is made, if there is an objection that the documents are confidential or privileged, it must be determined whether the objection is valid. *Berst v. Chipman*, 232 Kan. 180, 187, 653 P.2d 107 (1982). It follows that other objections should be addressed as well.

In various arguments made to the district court, KaMMCO referred to privileges or claims of confidentiality that can be categorized as potentially falling under K.S.A. 2009 Supp. 60-226(b) (work product), K.S.A. 2009 Supp. 60-226(c)(7) (trade secret or other confidential research, development, or commercial information), K.S.A. 60-426 (attorney-client privilege), K.S.A. 2009 Supp. 60-427 (physician-patient privilege), K.S.A. 2009 Supp. 65-4915 (peer review privilege), and common-law qualified privileges. Thus, at least in a general sense, KaMMCO raised claims of confidentiality or privilege.

Because of these asserted privileges, KaMMCO argues that if the district court believed the discovery was relevant it should have considered the claims of privilege before ordering KaMMCO to respond. KaMMCO cites to the holding in *Berst*, stating that "the court has a duty to conduct an in camera inspection." *Berst*, 232 Kan. at 187.

Allen notes, however, that subsequent to *Berst*, this court recognized that there are steps short of in camera inspection that can be used to consider claims of privilege, including the use of privilege logs. *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 426, 997 P.2d 681 (2000). Here, the request for a subpoena cited *Cypress Media* and provided that "[i]f any materials are claimed to be privileged, please provide a privilege log which identifies the material claimed to be privileged and specifies the basis for each privilege claimed." KaMMCO did not provide such a log. Further, as Allen notes, in various filings in the district court and in KaMMCO's arguments, KaMMCO spoke in generalities, never linking a specific privilege to specific documents that would be produced. Given that, Allen argues the district court did not have an obligation to consider whether the documents were privileged.

Allen's argument gains some support from K.S.A. 2009 Supp. 60-245(d)(2), which provides that if information subject to a subpoena is withheld on a claim of privilege "the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim." Further support is found in the rule that the party (or nonparty, as in the present case) objecting to discovery must provide precise reasons for the objection to discovery. See *Cypress Media,* 268 Kan. at 425 (citing *National Union Fire Ins. Co. v. Midland Bancor, Inc.,* 159 F.R.D. 562, 567 [D. Kan. 1994]).

The district court, however, did not make a finding that KaMMCO had failed to preserve its claimed privileges or that the privileges did not apply. Rather, the district court refused to rule on the privilege issues, indicating KaMMCO's objections were premature. KaMMCO argues this ruling is contrary to the direction in *Berst* and *Jones.* Further, although in its brief KaMMCO does not specifically address its reasons for failing to provide a privilege log, it does assert that "KaMMCO has no means of responding to some of the [discovery] requests without significant burden." And in one of the hearings before the district court, KaMMCO expressed difficulty in logging privileged materials or information due to the broad nature of Allen's discovery requests and contended it would be an undue burden if it was required to present specific privilege logs as to individual documents that are not within the permitted scope of discovery. Additionally, KaMMCO argues a privilege log would contain the proprietary information it seeks to protect. Further, before us at least, KaMMCO suggests that many of its privilege arguments can be addressed by category, *e.g.,* all risk management surveys are peer review materials. In summary, KaMMCO asserts that the district court needed to make some preliminary determinations before requiring KaMMCO to undertake the burden of creating a privilege log.

This argument ties into the third directive of the *Berst* court, suggesting that a district court faced with claims of privilege and undue burden should consider various factors that influence

whether a protective order should issue pursuant to K.S.A. 2009 Supp. 60-226(c).

### 3. *Weighing of Factors*

In its discussion, the *Berst* court advised district courts to exert general supervisory power over discovery and apply K.S.A. 2009 Supp. 60-226(c) by making "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." See *Berst*, 232 Kan. at 188. Other statutory provisions not discussed in *Berst* also grant district courts discretion to limit the scope and burden of discovery. For example, K.S.A. 2009 Supp. 60-245(c)(1) provides that reasonable steps should be taken to avoid undue burden and expense on a person subject to a subpoena, and K.S.A. 2009 Supp. 60-245(c)(3) explicitly authorizes the quashing or modification of a subpoena as a means of protecting a witness from misuse of the subpoena power. More specifically subsection (c)(3) provides that the district court shall quash or modify the subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies" if it "subjects a person to undue burden." K.S.A. 2009 Supp. 60-245(c)(3)(A)(iii), (iv).

This court in *Jones* also concluded that the district court should consider whether the information could be obtained without burdening a nonparty who claimed privileges. Specifically, the *Jones* court stated: "Questions may be directed to the [expert witness] doctor through interrogatories or by deposition which would elicit the evidence plaintiffs seek to show prejudice or bias." *Jones*, 243 Kan. at 455.

Each of these considerations arise from KaMMCO's general arguments that the discovery and even the preparation of a privilege log may be burdensome. Yet, all we have in the record to support this argument is KaMMCO's general claim. The decisions of this court have never demanded more. This low threshold creates the apparent problem of leaving the district court (and now this court) with no effective mechanism for conducting the balancing called for in *Berst*. While this court has never adopted a specific standard

for arguments related to burden, the federal courts have established requirements.

For example, the federal courts in the District of Kansas require a factual basis for a claim that discovery is unduly burdensome. More specifically, the objecting party must provide an affidavit or other evidentiary proof of the time and expense involved in responding to the discovery request. *E.g., Sonnino v. University of Kansas Hosp. Authority*, 220 F.R.D. 633, 653 (D. Kan. 2004). Consistent with the weighing of factors discussed in *Berst*, the federal courts require the objecting party to meet the burden of showing "not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery." *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 380 (D. Kan. 2005).

We adopt these federal standards and on remand direct compliance if an objection is made that either a discovery demand or a request to create a privilege log is unduly burdensome. Additionally we direct the district court to consider the other factors discussed in *Berst* and *Jones*.

### 4. *Protective Order*

Finally, on remand, the district court must consider the fourth duty imposed by the *Berst* court. Under that holding, if confidential or privileged documents are ordered to be produced, the district court has a duty to limit the availability and use of documents by utilizing protective provisions. *Berst*, 232 Kan. at 187.

### *Conclusion*

In summary, we conclude mandamus is an appropriate remedy because the district court did not perform the duties imposed in *Berst*. Consequently, we enter a writ of mandamus requiring the district court to comply with *Berst* in a manner consistent with this decision. However, we deny the petition for mandamus in part, concluding it would not be appropriate to quash the request for discovery. Finally, we order that the stay of the underlying action is lifted.

Case No. 102,164 is dismissed for lack of jurisdiction. The petition for mandamus in Case No. 102,075 is granted in part and denied in part.