NOT DESIGNATED FOR PUBLICATION

No. 121,922

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DANE CORY DEWEESE,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed August 6, 2021.
Appeal dismissed.

*Elizabeth Seale Cateforis*, of Paul E. Wilson Project for Innocence and Post-Conviction
Remedies, University of Kansas School of Law, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: In April 2014, a jury convicted Dane Cory DeWeese of the first-
degree murder of Kristen Tyler as well as conspiracy to commit the first-degree murder
of Tyler. DeWeese appealed his convictions to our Supreme Court, arguing that the State
had failed to disclose certain evidence that he could have used to discredit the testimony
of Joel Heil—his accomplice who also testified on behalf of the State at his jury trial—in
violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
But in January 2017, our Supreme Court affirmed DeWeese's convictions, rejecting his
*Brady* violation argument because there was no reasonable probability that the jury would

1

have reached a different verdict had the State timely disclosed the evidence in question. *State v. DeWeese*, 305 Kan. 699, 700, 387 P.3d 809 (2017).

A little less than a year after our Supreme Court issued its mandate, however, DeWeese moved under K.S.A. 60-1507 in the Saline County District Court, alleging that he was in custody unlawfully because Heil had recently recanted his incriminating testimony against him involving Tyler's murder. According to Heil's written and oral statements to DeWeese's private investigator, he had lied about DeWeese's involvement in Tyler's murder because he was coerced to do so by the district attorney who prosecuted his case and by Tyler's ex-husband. Nevertheless, before the trial court considered the merits of DeWeese's K.S.A. 60-1507 motion, Heil committed suicide.

Because of Heil's sudden unavailability, the State challenged the admissibility of Heil's recantation statements at any future evidentiary hearing in DeWeese's K.S.A. 60-1507 motion. The trial court agreed with the State's argument, ruling that Heil's recantation statements constituted inadmissible hearsay. Yet, after the trial court made this inadmissibility ruling, DeWeese moved to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Although not entirely clear, it seems that DeWeese moved to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice because he believed that doing so would allow him to immediately appeal the trial court's inadmissibility ruling to this court. In any case, once the trial court granted his motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice, DeWeese filed an appeal with this court.

Now, on appeal, DeWeese argues that the trial court erred by ruling that Heil's recantation statements were inadmissible hearsay. DeWeese specifically contends that Heil's recantation statements are admissible for two reasons: (1) because Heil's recantation statements comply with K.S.A. 60-460(j)'s declaration against interest hearsay exception and (2) because Heil's recantation statements are admissible under the limited hearsay exception addressed in *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.

Ct. 1038, 35 L. Ed. 2d 297 (1973). In its brief, the State argues that we lack jurisdiction over DeWeese's appeal because plaintiffs cannot appeal orders granting their motions to voluntarily dismiss their civil actions without prejudice under the Kansas statutes governing appellate jurisdiction. Notwithstanding this jurisdictional argument, the State also argues that the trial court's inadmissibility ruling was proper because Heil's recantation statements lack substantial assurances of trustworthiness, preventing their admission under K.S.A. 60-460(j)'s declaration against interest hearsay exception or under *Chambers'* limited hearsay exception.

Although DeWeese responds in his reply brief that we have jurisdiction over his appeal based on three distinct reasons, we reject his jurisdiction arguments. Simply put, a review and application of the law on voluntary dismissals without prejudice as well as the law on jurisdiction shows that Kansas has no statutory right allowing plaintiffs to appeal orders granting their motions to voluntarily dismiss their civil actions without prejudice. As a result, we dismiss DeWeese's appeal for lack of jurisdiction.

FACTS

In his direct appeal, our Supreme Court summarized the factual and procedural background of DeWeese's criminal case as follows:

"The State prosecuted DeWeese under the theory he and Joel Heil caused Kristen Tyler's death. The State essentially contended DeWeese initiated the events because he believed Tyler stole his money and drugs whereas Heil physically performed the lethal acts in DeWeese's presence. Heil extensively testified against DeWeese as part of a plea bargain with the State.

"*Tyler's murder*

"The State's witnesses and physical evidence showed that one night Tyler visited her friend Fancy Barboza at Barboza's house in Salina. Tyler brought along Chuck

3

Rowson, Barboza's step-father. Tyler asked if either Rowson or Barboza wanted methamphetamine, and Barboza answered yes. Tyler then allowed Barboza to come with her to get the drugs so long as Barboza promised to stay down in the back seat of the car. Barboza agreed, and the two left her house around 10:30 p.m.

"En route, Barboza climbed into the back seat per Tyler's instructions. A short time later, Barboza felt Tyler stop the car. Tyler got out while Barboza remained hidden. Tyler returned 10 to 15 minutes later, put the keys in the ignition, and left again with her cell phone.

"Barboza waited almost 2 hours, but Tyler never came back. When Barboza finally got out of the car, she saw it was parked by a bank close to DeWeese's house. The bank's video surveillance shows Barboza walking by around 1 a.m.

"At around 11 that same night, DeWeese had driven to Heil's house. He was upset and told Heil that money and drugs were missing from his garage and that he believed Tyler was responsible. DeWeese also told Heil that Tyler was currently at DeWeese's house to buy drugs. He wanted Heil's help in retrieving his money and drugs from Tyler, and Heil agreed.

"Heil changed clothes while DeWeese called Tyler. DeWeese told Tyler to give her phone to his fiancée, Megan Wells, who was also there. According to Heil, Tyler was not supposed to have a phone in DeWeese's house because 'funny stuff' was going on there.

"Before Heil left his house, he grabbed a log chain he kept in his kitchen and put it in a drawstring bag. While DeWeese drove them to his house, he told Heil his plan was to pick up Tyler and take her to the country.

"Once the two men arrived at DeWeese's house, they asked Tyler if she still wanted drugs. When Tyler said yes, they told her that she would have to go with them to another location to purchase the methamphetamine. Heil's intent was not to go buy drugs but to go beat up Tyler and retrieve DeWeese's money and drugs.

"DeWeese, Heil, and Tyler then left DeWeese's house. Heil noted Tyler's car across the street but was not aware Barboza was inside. As DeWeese drove, he slipped Tyler's cell phone—which he had retrieved from Wells—to Heil and told him that Tyler would not be coming back.

"DeWeese stopped at a gas station—not for gas but for the purpose of getting Tyler on surveillance cameras away from his house. The station's video surveillance showed Tyler entered the store at 11:39 p.m. and left a couple of minutes later.

4

"After they left the station, DeWeese drove into the country. When Tyler asked where they were headed, DeWeese explained they were making the deal in the country so if someone informed the police, they would know that one of the three of them was the informant.

"DeWeese stopped the car in a tunnel of an interstate overpass outside of Salina and popped the trunk. He walked to the back of the car, moved to the passenger side, and asked Heil if he was getting out. Heil exited the car, grabbing his chain from the trunk. DeWeese told Tyler to get out, and, when she complied, he asked about his drugs and money. Tyler replied she did not know what he was talking about.

"In response to Tyler's repeated denials, Heil swung his log chain and struck her in the head, causing her to fall down and start shaking. DeWeese then kicked Tyler, and Heil attempted to strangle her with the string of his hooded sweatshirt. They continued to beat and drag Tyler around the tunnel for 15 or 20 minutes. When she still made sounds, they dragged her near a fence and pushed her face into the muddy ground with their feet. Heil attempted to cover Tyler with grass while DeWeese picked up several dropped items and drove back and forth to cover any tracks.

"Afterward, DeWeese drove Heil back to Heil's house. During the drive, they discussed cleaning DeWeese's car and moving Tyler's car away from DeWeese's house. At this time Heil still had Tyler's cell phone but when it continued to receive calls, DeWeese took it from him. Records showed the phone was last powered on at 1:42 a.m.

"After arriving at Heil's house, Heil entered without DeWeese. Two neighbors were in the house along with Kimberly French, a juvenile runaway who was his housemate and the girlfriend of his cousin. Heil told the neighbors to leave and walked into his bedroom. After the neighbors left, French followed Heil into his bedroom where he told French that 'they had went and killed Kristin' and he was sorry for any involvement he had gotten her in.

"Ten minutes after Heil returned, DeWeese entered the house wearing different clothes than he had worn during Tyler's murder. DeWeese carried wet and muddy clothes, and he ordered French to get bags. French complied and grabbed a trash bag from the kitchen.

"DeWeese told French to put his wet and muddy clothes, Tyler's sweatshirt, and a tennis shoe in a trash bag. He mentioned checking the clothing for money. When Heil searched the sweatshirt he found money, which DeWeese pocketed. French then received

5

their approval to pour bleach and cleaner in the trash bag. Heil and DeWeese later spent 10 to 15 minutes cleaning DeWeese's car.

"Heil and DeWeese then went back into Heil's bedroom and talked about whether French knew too much and if they should move Tyler's car. DeWeese told Heil that French needed to be taken care of, and Heil said that wasn't going to happen. After this discussion, Heil pulled French into the room and told her that he and DeWeese had talked about 'tak[ing] care' of her. French testified that DeWeese told her not to say anything, which made her feel scared for her life.

"After the men decided to move Tyler's car, DeWeese gave the keys to Heil. Heil eventually drove it to an area across town with DeWeese following. While driving back from leaving Tyler's car, Heil threw the keys individually out of the window.

"They returned to DeWeese's house to pick up Wells and the couple's 2-month-old son to take them to the hospital emergency room. After dropping off mother and son, DeWeese took Heil back to Heil's house. Heil testified DeWeese reiterated to him that leaving French alive was a mistake.

"Later that day, Heil and French picked up the trash bags containing Heil's and DeWeese's clothes, the log chain, Tyler's sweatshirt, and the tennis shoe, and put them in a dumpster at his grandmother's house. During the next few days, Heil told four other individuals—Angela Helko, Joshua Tucker, Liz Garcia, and his mother—either that Tyler was dead or that he or 'we' had killed someone.

"Heil was arrested 2 weeks later. That same day Tyler's beaten body was found face down in 6-10 inches of water in a muddy ditch near a tunnel by the interstate.

"*Impeachment evidence against Heil*

"Heil testified extensively for the State [at DeWeese's eventual jury trial]. He admitted that per a plea bargain, he agreed to plead guilty to premeditated first-degree murder in exchange for the State agreeing to later drop murder conspiracy charges and to not seek a hard 50 sentence. Heil also agreed to plead guilty to conspiracy to commit robbery in a separate case—in exchange for dismissal of yet another case involving possession of methamphetamine. According to Heil, the sentences for conspiracy to commit robbery and for homicide would run concurrently. He also stated he would first serve a sentence for a probation violation.

6

"The 25-year-old Heil admitted to starting to use methamphetamine when he was 15 years old. He also admitted to selling drugs. He further testified that meth made him paranoid and violent—'a monster' when using—and that he was high on meth when Tyler was killed.

"Heil testified he first met DeWeese approximately 2 months before Tyler's death and admitted their association centered around drugs—primarily meth. He saved DeWeese's name as 'Ol' Boy' in his phone contacts. He also testified he had known Tyler since 2010. He admitted that several days before her death he had cut her car tires in retaliation for a friend. When Tyler asked Heil if he had anything to do with that event, he denied it. He also admitted he once had used equipment to check Tyler's car for electronic bugs and expressed his suspicions to other individuals that she was a police informant. Heil also testified that he and DeWeese were paranoid about confidential informants.

"According to Heil, 2 days before Tyler's death, they had an altercation about a trip he took to Wichita. Tyler agreed to lend her car so he could pick up drugs and his cousin. In exchange, Heil agreed to give Tyler 1.7 grams of meth worth $170. Before leaving Salina, Heil asked Tyler if she had fixed her car's tag lights. He was worried faulty lights would lead to a police stop—a concern when he also had no driver's license and would be carrying drugs. Tyler confirmed the tag lights were working. After this assurance, Heil left for Wichita with French.

"Heil testified that while driving to Wichita, he got a call from Tyler advising him that her tag lights were probably not working. After Heil stopped and discovered this was true, he was 'pissed.' He suspected that by not having fixed the lights, Tyler might have been setting him up to get pulled over by law enforcement.

"Heil further testified that when he got to Wichita, he eventually called his sister to pick him up because he refused to drive Tyler's car anymore. He was upset, and he and Tyler yelled at each other on the phone. He told her she would have to pick up her car in Wichita. Heil parked it between two buildings, left $20 in gas money in the front seat, and threw the keys on the floorboard. His sister then drove Heil, French, and a few other individuals back to Salina. They arrived early the morning of the murder.

"According to Heil, Tyler came to his house a few hours later—around 6 a.m.—cussing him and asking about the location of her car. He told her it was in Wichita but refused to give the exact location. Tyler left and returned 10 minutes later with Rowson. Heil and Tyler were both mad and cussed at each other. Tyler and Rowson repeatedly

asked Heil about her car's location, and Heil repeatedly refused to give a specific Wichita location.

"Heil and Tyler continued to argue, and Rowson threatened to put Heil in a vehicle and take him to Wichita. Heil responded by grabbing the log chain from the kitchen and hitting it on his living room couch. Heil told Rowson if Rowson was big enough to put him in the car, he would go with them. Heil testified he would have used the chain at that moment if necessary. He eventually provided the location of Tyler's car.

"In addition to Heil's testimony, his neighbor, Jayme Cartlich, testified that she was at his house the day of Tyler's death and the following day. She stated that early on the second day, Heil came in wet and dirty—and went straight to his bedroom without acknowledging her. Several weeks later Heil came to her house looking for 'Ol' boy or Ol' buddy'—which she said referred to her boyfriend and roommate, Max Hahn.

"The State also presented testimony from Leha Vaught, a friend of Heil's, who testified that a week after Tyler's death, Heil told her about the tag light episode. Heil said Tyler had called him to say the tag lights were out, that she was calling the cops, and he needed to be careful otherwise he would get caught. Heil also told her that he and 'Ol' Boy' had killed Tyler by taking her out to a dirt road on the premise of buying drugs, he had beaten her with a log chain and strangled her, and they both held her head under water until she quit moving. According to Vaught, Heil said 'he had to stop her before she . . . had called the cops because he could not get caught.'

"Vaught also testified that Heil had said he was upset with Tyler because on a couple of occasions she had 'stolen things from his house, stolen drugs from him.'

"The defense presented testimony from Stephanie Hewitt, an inmate in a temporary cellblock next to Heil after he was arrested. Hewitt testified that Heil admitted he had killed Tyler and someone else was with him. She also testified he told her that during his communications with Tyler about the tag light incident, Tyler threatened to call the cops because he didn't return her car and pay her like he had said. Per Hewitt, '[Heil] said, "Nobody fucks with me or my family," and that's why he killed her.'

"Also testifying for the defense was Heil's friend, Angela Helko. Heil told her that he and somebody else had killed someone. According to Helko, Heil identified that other person as Chuck or Charles—not Dane DeWeese.

"DeWeese testified in his own defense. He admitted that he resumed his meth use 2 months before Tyler's death, and his usage got heavier the second month. According to DeWeese, around 11:30 on the night of Tyler's death, he got a call from Heil saying he

8

needed a ride to get some dope. He then picked up Heil and Tyler. He admitted going to the gas station with them, traveling on the interstate, and obtaining drugs. But he testified he later dropped off Tyler and Heil at Heil's house and went home where he changed clothes and smoked some drugs Heil had given him. DeWeese expressly denied being with Heil at the scene of Tyler's death.

"DeWeese also testified to taking Wells and their baby to the hospital. But after they returned home, he received an early morning call from Heil, who asked for a ride to Heil's car. He picked up Heil and drove him to a car—not belonging to Heil—which turned out to be in front of DeWeese's house. Heil drove off, and DeWeese turned home.

"After a 12-day trial, the jury convicted DeWeese of Tyler's premeditated first-degree murder and conspiracy to commit first-degree murder.

. . . .

"The court later imposed a life sentence with a mandatory 25 years for premeditated first-degree murder and a consecutive sentence of 131 months for conspiracy to commit first-degree murder." *DeWeese*, 305 Kan. at 700-06, 708.


After our Supreme Court rejected DeWeese's *Brady* violation argument on appeal, DeWeese filed a K.S.A. 60-1507 motion with the trial court. In his K.S.A. 60-1507 motion, DeWeese argued that he was in custody unlawfully for three reasons: (1) because he was actually innocent as Heil "was coerced to lie and commit[] perjury" at his jury trial, (2) because his trial counsel was ineffective for failing to properly investigate and prepare his defense, and (3) because his trial counsel was ineffective for not adequately impeaching Heil's testimony. To support his primary argument of actual innocence, DeWeese attached three documents addressing Heil's recantation of his involvement in Tyler's murder. Specifically, DeWeese attached (1) the report his private investigator, Emery Goad, made after interviewing Heil's childhood friend, Tyrone Wagner, on October 20, 2017; (2) the report Goad made after interviewing Heil on December 18, 2017; and (3) the letter Heil wrote and gave Goad during his December 18, 2017 interview.

9

According to Goad's report on his interview with Wagner, Wagner told Goad that Heil sent him a letter in late September 2017 stating that DeWeese was not involved in Tyler's murder. Wagner alleged that, in Heil's letter, Heil explained that he had testified against DeWeese because he had believed that DeWeese had told law enforcement that he had murdered Tyler and therefore wanted revenge. Wagner also alleged that at some point, Heil had told him that he was recanting his prior testimony about DeWeese's involvement in Tyler's murder because he had been "struggl[ing] with his inner [c]onscience." Nevertheless, when Goad asked to see Heil's letter, Wagner alleged that he had lost Heil's letter. Similarly, although Wagner had directions from Heil to forward his letter to DeWeese's mother, Heil told Goad that he had lost DeWeese's mother's address as well.

As for Goad's December 18, 2017 interview with Heil, Goad reported that Heil told him that he had lied under oath about DeWeese's involvement in Tyler's murder because the prosecutor had threatened she would give him the hard 50 for Tyler's murder and impose the maximum penalty for his outstanding robbery and drug charges if he did not "finger" DeWeese. Goad further reported that Heil told him that he had lied about DeWeese's involvement in Tyler's murder because Tyler's ex-husband wanted him to testify against DeWeese. According to Goad, Heil said that Tyler's ex-husband had inmates in the Saline County Jail physically attack him and threaten his family to ensure that he would testify against DeWeese. Goad's report also stated that Heil told him that his mistreatment by the Saline County Jail staff caused him to falsely accuse DeWeese.

In addition to explaining why Heil falsely accused DeWeese of involvement in Tyler's murder, in Goad's report, Goad explained that Heil told him why he had murdered Tyler. Per Goad's report, Heil explained that he and Tyler had gone to the country to get high and go four-wheeling when they had a fight. Heil alleged that he never intended to kill Tyler, but Tyler died "as a result" of their fight. And Heil told Goad that although he

10

saw DeWeese the night of Tyler's murder, DeWeese merely provided him with a ride to get drugs.

Also, in his report, Goad provided details about Heil's time thus far in prison. Goad explained that Heil told him that when he was transferred to the Hutchison Correctional Facility (HCF) from Lansing Correctional Facility, a corrections officer gave his belongings to a different inmate. According to Goad, Heil told him that this inmate went through his belongings, found a letter in which he discussed testifying on behalf of the State at DeWeese's trial, and then read this letter out loud to other inmates. Goad reported that Heil told him this resulted in all the HCF inmates knowing that he was a snitch, which in turn resulted in some HCF inmates physically attacking Heil for being a snitch. Goad further reported that Heil told him that it was because the physical attacks that he must act "tough." And he explained to Goad that this was why he stabbed an HCF corrections officer in the face with a knife. At the same time, Goad reported that Heil told him that "he can't take the beatings" from the other inmates anymore and that he had previously checked himself into solitary for his own safety.

Lastly, Goad concluded his report by providing personal opinions about the veracity of Heil's recantation of DeWeese's involvement in Tyler's murder. Those opinions were as follows:

> "Heil is a very (total) self-serving person. I don't believe his motive in clearing [DeWeese] is out of respect for [DeWeese] or out of the 'goodness of his heart'. [Heil] has never had any guilt in his life, in my opinion.
>
> "I believe his motive (in this case) is to clear his reputation as a snitch, among the inmates. He wants to testify at a new trial for [DeWeese] (he will be a star) and for [DeWeese] to be exonerated so he can tell all other inmates [that] he is no longer a snitch.
>
> "Heil believes he is more intelligent than other inmates and guard staff. ([H]e may be[.])

"Heil has [a] 'little man' complex. He compensates by physically abusing guards, to cause inmates who would otherwise pick on him, [to] think he (Heil) is mean and strong and fear him."

As for the final document DeWeese attached to his K.S.A. 60-1507 motion—the letter Heil wrote and provided Goad during his December 18, 2017 interview—Heil's letter said the following:

"I[,] Joel Heil[,] lied under oath on [*sic*] [D]ane [D]eWeese having inv[olve]ment in the murder of Kristen Tyler [due] to threats to my family being stalked [and] threatened [and] I was attacked and told to confess [and] testify ag[a]inst Dane DeWeese[.] I wrote a letter [and] all before I confessed to murder about the attacks [and] stalking of my family[,] which was turn[ed] into [Corporal] Hagga[.] I did all this to protect my family and myself at that point and time. So[,] to be honest[,] Dane DeWeese [d]idn't have any inv[olve]ment in the murder of Kristen Tyler."

At the end of the letter, above his signature, Heil wrote a sentence swearing that the contents of his letter were true.

After DeWeese moved under K.S.A. 60-1507, the State responded that the trial court should dismiss DeWeese's K.S.A. 60-1507 motion because DeWeese's complaints were meritless. DeWeese, through his new counsel, Kurt Kerns, submitted a brief providing additional arguments why he was entitled to an evidentiary hearing on his K.S.A. 60-1507 motion. At the outset of the preliminary hearing on whether DeWeese was entitled to an evidentiary hearing on his K.S.A. 60-1507 motion, however, DeWeese announced that Heil had recently committed suicide. According to the State, Heil had killed himself, without leaving a suicide note, while awaiting sentencing for his "assaults on corrections officers" in the Leavenworth County Jail.

Although Heil could no longer testify on his behalf, DeWeese argued that Heil's letter and statements to Goad from his December 18, 2017 interview were admissible under K.S.A. 60-460(j)'s hearsay exception allowing the admission of declarations against interest. The State responded that Heil's recantation statements constituted inadmissible hearsay. At the end of the hearing, the trial court told the parties that it would issue an order on whether DeWeese was entitled to an evidentiary hearing on his K.S.A. 60-1507 motion.

The trial court ruled that DeWeese was entitled to a full evidentiary hearing on his K.S.A. 60-1507 motion. But its order did not address whether Heil's recantation statements would be admissible at DeWeese's evidentiary hearing on his K.S.A. 60-1507 motion.

At the next scheduling hearing, however, the State suggested that the trial court should hold a separate hearing on the admissibility of Heil's recantation statements before holding the evidentiary hearing on DeWeese's K.S.A. 60-1507 motion. DeWeese did not object to the State's suggestion. As a result, the trial court agreed to consider the admissibility of Heil's recantation statements at a preliminary hearing before holding the evidentiary hearing on DeWeese's K.S.A. 60-1507 motion. The trial court then provided the parties with the opportunity to submit briefing on the admissibility issue before the preliminary hearing.

In his brief, DeWeese argued that the trial court should admit Heil's recantation statements from his letter to Goad, Heil's recantation statements from his interview with Goad, and Heil's recantation statements from a recorded interview with the State's investigator into evidence at his evidentiary hearing on his K.S.A. 60-1507 motion for two reasons. First, DeWeese continued to maintain that Heil's recantation statements were admissible under K.S.A. 60-460(j)'s declaration against interest hearsay exception. In particular, he asserted that Heil's recantation statements were declarations against

13

interest because Heil admitted that he had lied under oath at his trial, which exposed Heil to a possible perjury charge.

Second, DeWeese asserted that Heil's recantation statements were admissible under the limited hearsay exception outlined by the United States Supreme Court in its *Chambers* decision. In *Chambers*, the United States Supreme Court reversed Leon Chambers' murder conviction and remanded his case for a new trial because, at his initial trial, the trial court's application of Mississippi's "party witness" and hearsay rules prevented Chambers from cross-examining Gable McDonald as an adverse witness *and* from calling witnesses who would have testified that McDonald had confessed to shooting the police officer Chambers had been convicted of murdering. 410 U.S. at 294. The *Chambers* Court held that under these limitations, Chambers' right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution was violated. 410 U.S. at 302. As applied to his case, DeWeese argued that the *Chambers* decision established that he "ha[d] a constitutional right to present [Heil's recantation statements] to show his actual innocence" at the evidentiary hearing on his K.S.A. 60-1507 motion.

In its reply brief, the State countered that Heil's recantation statements were not admissible under K.S.A. 60-460(j)'s declaration against interest hearsay exception because Heil's recantation statements were not really against his interest. The State asserted that although Heil may have faced a perjury charge because of his recantation statements, Heil nonetheless benefited from recanting DeWeese's involvement in Tyler's murder. The State emphasized that according to Goad's report, Heil had been repeatedly attacked by other inmates because those inmates knew that he was a snitch. And it emphasized that as a convicted murderer facing a 25 years-to-life sentence, Heil would face no meaningful consequences for confessing to perjury. As a result, the State alleged that Heil's motivation for recanting DeWeese's involvement in Tyler's murder was not because he believed that DeWeese was actually innocent. Instead, his motivation was to

14

mitigate his reputation as a snitch to improve his quality of life while in prison, rendering his recantation statements entirely untrustworthy.

On DeWeese's reliance on *Chambers*, the State argued that the *Chambers* decision actually supported its position that Heil's recantation statements constituted inadmissible hearsay because even under *Chambers'* limited hearsay exception, DeWeese had to establish that Heil's recantation statements bore persuasive assurances of trustworthiness before those statements could be admitted into evidence.

The trial court held a hearing on the admissibility of Heil's recantation statements. At the beginning of the hearing, the trial court provided the parties with the chance to supplement their briefs with oral argument. But both DeWeese and the State declined this opportunity, deciding to rely solely on the admissibility arguments they had made in their briefs.

Immediately afterwards, the trial court ruled from the bench that Heil's recantation statements were inadmissible hearsay. In doing so, the trial court first emphasized that Kansas caselaw established that a disputed hearsay statement cannot be admitted under K.S.A. 60-460(j)'s declaration of interest hearsay exception unless it has a "measure of trustworthiness." It also emphasized that Kansas caselaw established that a disputed hearsay statement that opens the declarant up to potential punishment is not necessarily a declaration against interest under K.S.A. 60-460(j).

Then, the trial court reviewed the evidence from DeWeese's trial that supported DeWeese's guilt and that Heil's recantation statements did not adequately address. This trial evidence included the following: (1) DeWeese's and Heil's numerous cell phone calls and texts to each other the night of Tyler's murder, (2) DeWeese's admission that he provided Tyler a ride the night of her murder, (3) French's testimony that DeWeese and Heil gave her their muddy clothes with directions to "put them in a bag" and bleach them,

15

and (4) French's testimony that shortly after DeWeese and Heil gave her their muddy clothes, Heil confessed to her that he and DeWeese had just murdered Tyler. In recounting this evidence against DeWeese, the trial court further noted that DeWeese was able to present evidence of Heil's "numerous prior inconsistent statements" at his trial, including through his own trial testimony.

Next, the trial court reviewed Goad's report detailing his December 18, 2017 interview with Heil, noting that Heil had been physically attacked and "checked into solitary for his own safety" because of his reputation as a snitch. And the trial court emphasized that Heil had stabbed a corrections officer in the face in an effort to mitigate his reputation as a snitch. Based on this evidence, the trial court then made the following ruling:

> "[Heil's recantation] statements are clearly hearsay, they're out of court, they would be offered to prove the truth of the matter asserted, that being that Dane DeWeese was not involved. The declarant in this case is unavailable as Joel Heil committed suicide previously.
>
> "And as I indicated the question really is [K.S.A. 60-]460(j) implicated, and after giving this a lot of thought and reviewing counsel's briefs, the Court finds that there is not sufficient indicia of trustworthiness to admit Joel Heil's prior uncorroborated statements. The Court views them as very self-serving, they are not a statement against interest[]. If an individual is willing to stab another human in the face to reduce the physical implications of his prison stay, a small count of perjury or an increased amount of time with the already lengthy sentence he was serving, would pale in comparison to the physical trauma that he was enduring [and] that I'm sure[,] among other things[, led] to his suicide. I'm sure that was a multifaceted decision by him as it relates to all of the reasons that he would do such a thing.
>
> "But the Court just simply agrees with the State's analysis of this situation. I don't find that there is a sufficient indicia of trustworthiness to even pass the bar of admissibility. And I understand my job is not to weigh or to be the trier of fact to weigh, but there has to be more than simply this statement. It is self-serving, its motive is clear and the probability of veracity is the safeguard sought and the Court has none in this

16

situation and I don't see any probability of veracity based on the circumstances that led up to the statement and all of the surrounding circumstances.

"And that doesn't go into the analysis of even the impact if Mr. Heil was here and the impact on a [K.S.A. 60-]1507 [motion]. This is simply the evidentiary analysis for whether it would be admissible and I find that none of his prior out-of-court statements recanting Dane DeWeese's involvement to be admissible under [K.S.A.] 60-460(j).

"And counsel, then without that indicia of reliability the Court's same analysis really applies to the defense's assertion that when a declarant's unavailable that the Court can allow hearsay if there is sufficient indicia of reliability and so that same analysis would apply."

Once the trial court ruled that Heil's recantation statements constituted inadmissible hearsay, the trial court asked Kerns if its ruling provided him "clear guidance in how to proceed with [DeWeese's K.S.A. 60-1507 motion.]" Kerns responded that he needed to discuss the matter with DeWeese. As a result, the trial court explained that it would not schedule DeWeese's evidentiary hearing on his K.S.A. 60-1507 motion that day. Instead, it would schedule DeWeese's evidentiary hearing on his K.S.A. 60-1507 motion at a phone conference in about three weeks as this would provide Kerns the time that he needed to talk with DeWeese about the trial court's inadmissibility ruling.

Nevertheless, when the trial court held this phone conference, Kerns announced that after talking with DeWeese, DeWeese had decided to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. When Kerns made this announcement, the State did not object to DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. In fact, Kerns indicated that the State approved of DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Then, about a month later, the trial court entered a journal entry (1) that ruled that Heil's recantation statements were inadmissible and (2) that granted DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Afterwards, DeWeese filed an appeal with us.

17

As just noted, after the trial court ruled that Heil's recantation statements constituted inadmissible hearsay, the trial court granted DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. For reasons unclear, it seems that Kerns believed that voluntarily dismissing DeWeese's K.S.A. 60-1507 motion without prejudice would allow DeWeese to immediately appeal the trial court's ruling that Heil's recantations statements constituted inadmissible hearsay. This is apparent because at the start of DeWeese's June 10, 2019 scheduling hearing, Kerns and the trial court engaged in the following exchange:

> "MR. KERNS: Yeah, Judge, I talked with [the district attorney] about it and I also met with my client about it and we're electing to just dismiss the appeal [*sic*] on that via hearsay with Joel Heil issue [*sic*].
> "THE COURT: Okay.
> "MR. KERNS: And so I'll get the Court a Journal Entry forthwith and I'll get it to [the district attorney] as well.
> "THE COURT: Thank you, counsel."

When the trial court signed the journal entry that Kerns presumably submitted a little over a month later—July 15, 2019—the trial court first ruled that "[t]he proffered statements of Joel Heil constitute hearsay and will not be allowed into evidence at any subsequent hearing." It then granted DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice, stating: "Noting that the bulwark of [DeWeese's] claims are premised on said statements, and further noting the State has no objection to a dismissal without prejudice in order for [DeWeese] to perfect an appeal on said hearsay statements, the Court hereby dismisses [DeWeese's] petition without prejudice." Then, when DeWeese filed his notice of appeal a little less than a month later—August 9, 2019—he stated that he was appealing the trial court's July 15, 2019 "journal entry of dismissal."

18

In his appellant brief, DeWeese never addresses the fact that he now appeals a K.S.A. 60-1507 motion that he voluntarily dismissed without prejudice. Instead, the State first addresses this fact in its appellee brief. According to the State, we lack jurisdiction over DeWeese's appeal because he voluntarily dismissed his K.S.A. 60-1507 motion without prejudice. Highly summarized, the State argues that we lack jurisdiction over DeWeese's appeal because no Kansas statute provides us with the authority to review appeals from parties who have voluntarily dismissed their K.S.A. 60-1507 motions without prejudice.

In his reply brief, DeWeese counters the State's jurisdiction argument in a several ways. First, DeWeese seemingly suggests that we can interpret the trial court's July 15, 2019 journal entry as something other than an order granting his motion for the voluntary dismissal of his K.S.A. 60-1507 motion without prejudice. Second and alternatively, DeWeese argues that we can "assert jurisdiction" by "determine[ing] that the [trial] court's ruling constituted a final decision on the K.S.A. 60-1507 motion" as meant under K.S.A. 2020 Supp. 60-2102(a)(4). Third and alternatively, DeWeese argues that we can assert jurisdiction (1) by ruling that his appeal was "an impermissible, procedurally flawed, and untimely" interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) and (2) by then further ruling that Kerns provided ineffective assistance of counsel by asking to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice.

*Law on Jurisdiction and Voluntary Dismissals*

Whether jurisdiction exists is a question of law over which we exercise unlimited review. *Wiechman v. Huddleston*, 304 Kan. 80, 84, 370 P.3d 1194 (2016). Also, we have a duty to question jurisdiction on our own initiative when the record on appeal indicates that we lack jurisdiction. And when the record on appeal definitively establishes that we lack jurisdiction, we have a duty to dismiss the appeal. 304 Kan. at 84-85.

On voluntary dismissals, we note that K.S.A. 2020 Supp. 60-241(a)(2) states that, absent certain exceptions, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." K.S.A. 2020 Supp. 60-241(a)(2) further states that "[u]nless the [trial court's] order states otherwise, a dismissal under [K.S.A. 60-241(a)(2)] is without prejudice." In turn, when a trial court enters an order granting a plaintiff's voluntary dismissal without prejudice motion, nothing bars that plaintiff from later refiling his or her action with the trial court. Notably, such voluntary dismissal orders entered by the court must be distinguished from a plaintiff's voluntary dismissal of his or her civil action without a court order. See K.S.A. 2020 Supp. 60-241(a)(1)(B) (stating that when plaintiffs voluntarily dismiss their civil claims without court order *and* they have previously dismissed any other federal or state court actions based on or including the same civil actions, such dismissals constitute adjudication on merits).

In any case, in civil cases where a trial court grants a plaintiff's voluntary dismissal without prejudice motion in accordance with K.S.A. 2020 Supp. 60-241(a)(2), our Supreme Court has held that "[a] dismissal without prejudice does not have the effect of res judicata." *Crockett v. Medicalodges, Inc.*, 247 Kan. 433, 438, 799 P.2d 1022 (1990), *overruled on other grounds by Martin v. Naik*, 297 Kan. 241, 300 P.3d 625 (2013). Because this order has no res judicata effect, however, it necessarily follows that this order is not adjudication on the merits. See *Crocket*, 247 Kan. at 438; *Taylor v. International Union of Electronic Workers, et al.*, 25 Kan. App. 2d 671, 675, 968 P.2d 685 (1998) (holding that plaintiff's voluntary dismissal of lawsuit did not constitute failure "'upon the merits,'" meaning that plaintiff could refile lawsuit under K.S.A. 60-518's saving statute); see also *Pinson v. Equifax Credit Information Services, Inc.*, 316 Fed. Appx. 744, 751 (10th Cir. 2009) (unpublished opinion) (holding that plaintiff's voluntary dismissal without prejudice left parties in same position as if plaintiff never sued). And for this same reason, it necessarily follows that Kansas appellate courts lack

jurisdiction over appeals from plaintiffs challenging trial court orders granting their motions for voluntarily dismissal without prejudice.

Indeed, in *Bain v. Artzer*, 271 Kan. 578, Syl. ¶ 2, 25 P.3d 136 (2001), our Supreme Court explicitly reached this holding, explaining: "*A trial court's order granting a motion for voluntary dismissal without prejudice is not a final order and, as such, an appellate court is without jurisdiction to consider an appeal of that order*." (Emphasis added.) See *Banking Co. v. Ball*, 59 Kan. 55, 57, 51 P. 899 (1898) (holding that court "cannot retain jurisdiction if the plaintiff dismisses in compliance with prescribed forms"); *Daugherty v. Pulte Homes of Greater Kansas City, Inc.*, No. 116,506, 2017 WL 3575728, at *4 (Kan. App. 2017) (unpublished opinion) (explaining that appellant's voluntary dismissal of his appeals had "the effect of removing our jurisdiction over those appeals and placing the parties in the position they were in after the judgment was entered but before the appeals were taken"); see also *Eastom v. City of Tulsa*, 783 F.3d 1181, 1185 (10th Cir. 2015) (holding that trial court's order was not final appealable order when plaintiff voluntarily dismissed his 42 U.S.C. § 1983 action without prejudice because the plaintiff could refile his § 1983 action).

As for Kansas appellate jurisdiction more broadly, our Supreme Court has consistently held that "[t]he right to appeal in a civil case is entirely statutory and not a right guaranteed by the United States Constitution or the Kansas Constitution." *Wiechman*, 304 Kan. 80, Syl. ¶ 1. This means that "Kansas appellate courts have jurisdiction to entertain an appeal in a civil case only if that appeal is taken within the time limitations and in the manner prescribed by the applicable statutes." 304 Kan. 80, Syl. ¶ 1; see also *Harsch v. Miller*, 288 Kan. 280, 287, 200 P.3d 467 (2009) (holding that "the right to appeal is entirely statutory and that the limits of [appellate] jurisdiction are imposed by the legislature"). In fact, in the recent *Wiechman* decision, our Supreme Court reaffirmed this longstanding rule when it overruled its precedent in *Brown v. Fitzpatrick*, 224 Kan. 636, 585 P.2d 987 (1978)—a case where it created an exception

allowing parties to appeal an order setting aside a final judgment in a civil case even though no such appeal right existed under our applicable statutes. *Wiechman*, 304 Kan. at 87-88. The *Weichman* court explained that *Brown* was no longer good law because Kansas appellate courts cannot make "judicially created appeal right[s] in a civil case." 304 Kan. at 81. As a result, our Supreme Court precedent establishes that we have jurisdiction to entertain civil appeals only if the appealing parties have complied with the applicable Kansas statutes on perfecting civil appeals.

Here, the applicable statutes governing our jurisdiction fall under K.S.A. 60-2101 et seq. K.S.A. 60-2101(a) states that we "shall have jurisdiction to hear appeals from district courts." It also provides that "appeals from the district court to the court of appeals in civil actions shall be subject to the provisions of K.S.A. 60-2102, and amendments thereto." K.S.A. 60-2101(a).

Once again, DeWeese's second alternative jurisdiction argument asks us to construe the trial court's July 15, 2019 journal entry as a final decision that is appealable under K.S.A. 2020 Supp. 60-2102(a)(4). And his third alternative jurisdiction argument asks us to construe his appeal as an impermissible, procedurally flawed, and untimely interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) that is rendered permissible by Kerns' ineffective assistance of counsel. Thus, DeWeese's alternative jurisdictional arguments hinge on our having jurisdiction under either K.S.A. 2020 Supp. 60-2102(a)(4) or K.S.A. 2020 Supp. 60-2102(c).

In relevant part, K.S.A. 2020 Supp. 60-2102(a)(4) states that parties may appeal to this court "as a matter of right" when those parties challenge "[a] final decision in any action, except in an action where a direct appeal to the supreme court is required by law." Previously, our Supreme Court has defined the term "final decision," as meant under K.S.A. 2020 Supp. 60-2102(a)(4), as a decision "which finally decides and disposes of the entire merits of the controversy and reserves no further questions or directions for the

future or further action of the court." *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, Syl. ¶ 5, 244 P.3d 642 (2010). So under our Supreme Court precedent, a trial court's decision is not final under K.S.A. 2020 Supp. 60-2102(a)(4) unless it definitively resolved the appealing party's civil action, meaning there is nothing else for the trial court to decide regarding the appealing party's civil action. This rule, that is, accepting a party's appeal only if the trial court's order constituted a final decision, is also consistent with our Legislature's desire to avoid piecemeal appeals resulting in an "appellate yo-yo." *Harsch*, 288 Kan. at 288. Of further note, when a party appeals a final decision under K.S.A. 2020 Supp. 60-2102(a)(4), that party must file its notice of appeal no later than 30 days after the trial court entered its final decision. K.S.A. 2020 Supp. 60-2103(a).

On the other hand, K.S.A. 2020 Supp. 60-2102(c) states that interlocutory appeals to this court are permissible under the following circumstances:

"*When a district judge . . .* in making in a civil action an order not otherwise appealable under this section, *is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order*. The court of appeals may thereupon, in its *discretion*, permit an appeal to be taken from such order, if application is made to it within *14 days* after the entry of the order under such terms and conditions as the supreme court fixes by rule. Application for an appeal pursuant to this subsection shall not stay proceedings in the district court unless the judge of the district court or an appellate court or a judge thereof so orders." (Emphases added.)

On K.S.A. 2020 Supp. 60-2102(c)'s requirement that the trial court "state in writing" that the "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," our Supreme Court has explained that to bring such an appeal under K.S.A. 2020 Supp. 60-2102(c), the trial

court's order must include these additional findings. See *Jenkins v. Chicago Pacific Corp.*, 306 Kan. 1305, 1308, 403 P.3d 1213 (2017); *City of Neodesha v. BP Corporation*, 295 Kan. 298, Syl. ¶ 3, 287 P.3d 214 (2012); *Svaty*, 291 Kan. at 610. These additional findings are necessary because whether to enter an order allowing an interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) lies within the trial court's sound discretion. *Svaty*, 291 Kan. at 610. Correspondingly, whether to permit an interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) when the trial court has complied with its requirement to make these additional findings lies within our sound discretion. 291 Kan. at 610. Thus, even if a party is appealing from a trial court order that complies with K.S.A. 2020 Supp. 60-2102(c)'s additional findings requirement, we are not bound by the trial court's findings, and we may exercise our discretion to reject that party's interlocutory appeal.

*No Jurisdiction over DeWeese's Appeal*

Having reviewed the applicable law concerning our jurisdiction and voluntary dismissals, we now consider DeWeese's three alternative jurisdiction arguments. Although not entirely clear, in his first alternative jurisdiction argument, DeWeese seemingly suggests that he did not voluntarily dismiss his K.S.A. 60-1507 motion. For example, in discussing his third alternative jurisdiction argument, he asserts that "if this court determines the record supports the State's assertions that [he] voluntarily dismissed his K.S.A. 60-1507 motion, based on a statement by counsel," then this court should determine that his appeal is an impermissible interlocutory appeal rendered permissible by Kern's incompetence. Thus, in addressing this court's jurisdiction, DeWeese implies that we can interpret the trial court's July 15, 2019 journal entry as doing something other than granting his motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Yet, DeWeese's first alternative argument is fatally flawed.

To review, at DeWeese's June 10, 2019 scheduling hearing, Kerns explicitly told the trial court that, after speaking to DeWeese, DeWeese had decided to dismiss his

24

K.S.A. 60-1507 motion. Also, at this scheduling hearing, the trial court accepted Kerns offer to write the journal entry granting DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. As a result, the record on appeal indicates that Kerns drafted the July 15, 2019 journal entry the trial court ultimately signed and entered, which clearly stated that it was granting DeWeese's voluntary dismissal motion without prejudice and then "dismiss[ed DeWeese's] petition without prejudice." Also, DeWeese's August 9, 2019 notice of appeal explicitly stated that he was appealing the trial court's July 15, 2019 "journal entry of dismissal."

Simply put, the record on appeal definitively establishes that it was not a simple slip of tongue that resulted in the trial court granting DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Instead, the record on appeal definitively establishes that the trial court granted DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice after DeWeese, through his attorney Kerns, requested that it voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. As a result, it is an indisputable fact that DeWeese's current appeal comes to us upon the trial court's order granting his explicit request to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Also, to the extent DeWeese asserts he should not be bound by Kern's request to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice, this assertion ignores that in "our system of representative litigation, . . . each party is deemed bound by the acts of his [or her] lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash Railroad Co.*, 370 U.S. 626, 634, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962). Thus, regardless of his apparent contention to the contrary, DeWeese is bound by Kerns' motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice on his behalf.

Turning to DeWeese's second alternative jurisdiction argument, we note that it hinges on his belief that the trial court's ruling that Heil's recantation statements were inadmissible hearsay constituted "an effective denial of relief on the merits of [his]

25

K.S.A. 60-1507" motion. DeWeese contends that because the trial court's July 15, 2019 journal entry noted that "the bulwark of [his] claims [were] premised on [Heil's recantation] statements," the trial court's July 15, 2019 journal entry "should be construed as a final decision under K.S.A. 2020 Supp. 60-2102(a)(4)." In making this argument, DeWeese further points out that if this court construes the trial court's July 15, 2019 journal entry as a final decision under K.S.A. 2020 Supp. 60-2102(a)(4), then his August 9, 2019 notice of appeal was timely filed under K.S.A. 2020 Supp. 60-2103(a).

Although DeWeese's August 9, 2019 notice of appeal would be timely filed if the trial court's July 15, 2019 journal entry constituted a final decision under K.S.A. 2020 Supp. 60-2102(a)(4), it is readily apparent that the trial court's July 15, 2019 journal entry did not constitute a final decision under K.S.A. 2020 Supp. 60-2102(a)(4). Thus, whether DeWeese filed his notice of appeal within 30 days of the trial court filing its July 15, 2019 journal entry is irrelevant.

Once more, our Supreme Court has defined the term "final decision" as meant under K.S.A. 2020 Supp. 60-2102(a)(4), as a decision "which *finally decides and disposes of the entire merits of the controversy* and reserves no further questions or directions for the future or further action of the court." (Emphasis added.) *Svaty*, 291 Kan. 597, Syl. ¶ 5. Nevertheless, the plain language of K.S.A. 2020 Supp. 60-241(a)(2) provides that unless otherwise stated in its order, a trial court's order granting a plaintiff's voluntary dismissal request is without prejudice. And here, the trial court's July 15, 2019 journal entry explicitly stated that it dismissed DeWeese's K.S.A. 60-1507 motion without prejudice. Thus, nothing barred DeWeese from refiling another K.S.A. 60-1507 motion later, meaning the trial court's July 15, 2019 journal entry did not finally decide and dispose of the entire merits of DeWeese's K.S.A. 60-1507 motion. In turn, the plain language of K.S.A. 2020 Supp. 60-241(a)(2) establishes that voluntary dismissals without prejudice are not appealable final decisions under K.S.A. 2020 Supp. 60-2102(a)(4).

26

Also, as explained already, when trial courts grant plaintiffs' motions to voluntarily dismiss their civil actions without prejudice, the trial courts' voluntary dismissal orders do not constitute an adjudication on the merits of those plaintiffs' civil actions. *Crockett*, 247 Kan. at 438. Instead, when a trial court grants a plaintiff's voluntary dismissal motion without prejudice, both the plaintiff and the defendant are put in the same position as if the plaintiff had never filed his or her civil action. *Taylor*, 25 Kan. App. 2d at 675; see *Pinson*, 316 Fed. Appx. at 751. Stated another way, once a trial court grants a plaintiff's motion to voluntarily dismiss his or her civil action without prejudice, that plaintiff no longer has any action, case, or controversy before the trial court because that plaintiff has willingly removed his or her civil action, case, or controversy from the trial court's jurisdiction. This is undoubtedly why in *Bain*, our Supreme Court held that "[a] trial court's order granting a motion for voluntary dismissal without prejudice is not a final order and, as such, an appellate court is without jurisdiction to consider an appeal of that order." 271 Kan. 578, Syl. ¶ 2. And although under an older precedent, this is undoubtedly why our Supreme Court in *Banking Co.* held that once a plaintiff moved to voluntarily dismiss its foreclosure action against a mortgagor, the trial court's "jurisdiction over the parties and the subject-matter of the action was at an end for all purposes except to render and enter a formal order of dismissal." 59 Kan. at 56.

We are duty-bound to follow our Supreme Court precedent absent some indication that our Supreme Court is moving away from its previous position. *Tillman v. Goodpasture*, 56 Kan. App. 2d 65, 77, 424 P.3d 540 (2018). DeWeese has cited no authority to support his contention that we may assert jurisdiction by construing the trial court's July 15, 2019 journal entry granting his motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice as a final decision under K.S.A. 2020 Supp. 60-2102(a)(4). This, in and of itself, requires us to reject DeWeese's second alternative jurisdiction argument. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (holding that failure to support argument with authority, to show why argument is

27

sound despite lack of supporting authority, or to show why argument is sound in face of contrary authority is akin to not adequately briefing argument). Yet, notwithstanding this problem, our Supreme Court precedent definitively establishes that the trial court's July 15, 2019 journal entry granting DeWeese's motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice does not constitute a final decision under K.S.A. 2020 Supp. 60-2102(a)(4). In short, this precedent proves that a trial court's order granting a plaintiff's voluntary dismissal motion without prejudice cannot constitute a final decision on the merits because such an order does not constitute an adjudication on the merits. So despite DeWeese's arguments otherwise, we do not have jurisdiction to entertain his appeal under K.S.A. 2020 Supp. 60-2102(a)(4).

As for DeWeese's third alternative jurisdiction argument, it is equally unpersuasive. Once again, DeWeese argues that we may assert our jurisdiction by determining that his appeal was an impermissible, procedurally flawed, and untimely interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) that is rendered permissible based on Kerns' ineffective assistance of counsel. But there are numerous problems with this argument.

For starters, although DeWeese never explains why the trial court's July 15, 2019 journal entry and his notice of appeal do not comply with K.S.A. 2020 Supp. 60-2102(c)'s plain language, DeWeese nonetheless concedes that the trial court's July 15, 2019 journal entry and his notice of appeal do not comply with K.S.A. 2020 Supp. 60-2102(c) as he has argued that his appeal was impermissible, procedurally flawed, and untimely. In this respect, DeWeese's third alternative jurisdiction argument is correct. Since the trial court's July 15, 2019 journal entry did not state that an immediate appeal from its hearsay ruling may materially advance the ultimate termination of DeWeese's K.S.A. 60-1507 motion because its hearsay ruling involved a controlling question of law as to which there was substantial ground for difference of opinion, the trial court's July 15, 2019 journal entry does not comply with K.S.A. 2020 Supp. 60-2102(c)'s

28

additional findings requirement. Likewise, even if the trial court had complied with K.S.A. 2020 Supp. 60-2102(c)'s additional findings requirement, DeWeese did not comply with K.S.A. 2020 Supp. 60-2102(c)'s requirement to file his notice of appeal within 14 days of the trial court's final order. In fact, DeWeese filed his notice of appeal a full 25 days after the trial court entered its July 15, 2019 journal entry from which he appeals.

As a result, DeWeese has correctly conceded that his appeal from the trial court's July 15, 2019 journal entry does not comply with K.S.A. 2020 Supp. 60-2102(c)'s plain language on interlocutory appeal procedures. By making this concession, however, DeWeese has also implicitly conceded that we lack jurisdiction over his appeal. As previously discussed, according to our Supreme Court's precedent, the trial court must make the additional findings regarding the need for an immediate appeal for a party to file interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c). See *Jenkins*, 306 Kan. at 1308; *City of Neodesha*, 295 Kan. 298, Syl. ¶ 3; *Svaty*, 291 Kan. at 610. Likewise, "Kansas appellate courts have jurisdiction to entertain an appeal in a civil case only if that appeal is taken within the time limitations . . . prescribed by the applicable statutes." *Wiechman*, 304 Kan. 80, Syl. ¶ 1. So we have no jurisdiction under K.S.A. 2020 Supp. 60-2102(c) unless the trial court made the proper additional findings required by this subsection.

Because it is readily apparent that the trial court's order from which DeWeese is appealing and the notice of appeal do not comply with K.S.A. 2020 Supp. 60-2102(c)'s plain language, we lack jurisdiction to entertain DeWeese's appeal under K.S.A. 2020 Supp. 60-2102(c).

CONCLUSION

In summary, DeWeese makes three alternative arguments that we have jurisdiction over his appeal from the trial court's journal entry granting his motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. In his first argument, DeWeese suggests that we can assert jurisdiction over his appeal by interpreting the trial court's July 15, 2019 journal entry as something other than an order granting his request for the voluntary dismissal of his K.S.A. 60-1507 motion. In his second argument, DeWeese argues that we can assert jurisdiction over his appeal because the trial court's July 15, 2019 journal entry effectively constituted an appealable final decision under K.S.A. 2020 Supp. 60-2102(a)(4). And in his third alternative argument, DeWeese argues that we can assert jurisdiction (1) by first ruling that his appeal constituted an impermissible, procedurally flawed, and untimely interlocutory appeal under K.S.A. 2020 Supp. 60-2102(c) and (2) by then further ruling that Kerns provided ineffective assistance of counsel by successfully moving to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice.

But the record on appeal definitively establishes that DeWeese has appealed from a journal entry in which the trial court granted his motion to voluntarily dismiss his K.S.A. 60-1507 motion without prejudice. Also, an order granting a plaintiff's motion to voluntarily dismiss his or her civil action without prejudice under K.S.A. 2020 Supp. 60-241(a)(2) does not constitute an adjudication on the merits, meaning such a voluntary dismissal is not a final decision under K.S.A. 2020 Supp. 60-2102(a)(4). Also, by conceding that his notice of appeal does not comply with K.S.A. 2020 Supp. 60-2102(c)'s procedural requirements for docketing an interlocutory appeal, DeWeese has implicitly conceded that we lack jurisdiction over his appeal as an interlocutory appeal. Indeed, even if Kerns provided constitutionally deficient performance, DeWeese has failed to establish that Kerns' deficient performance prejudiced him because he has not shown that the trial court would have allowed him to file an interlocutory appeal under K.S.A. 2020

Supp. 60-2102(c) to challenge its inadmissibility ruling but for Kerns' voluntary dismissal of his K.S.A. 60-1507 motion without prejudice.

As a result, we reject each of DeWeese's three alternative jurisdiction arguments. Thus, we dismiss DeWeese's appeal for lack of jurisdiction.

Appeal dismissed.